THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HERBERT CARL McGRATH *et al.*, Defendants-Appellants.

First District (1st Division) Nos. 1—87—2621, 1—87—2805 cons.

Opinion filed December 29, 1989.

James R. Epstein, of Epstein, Zaideman & Esrig, P.C. (Mary Ellen Dienes, of counsel), for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, William D. Carroll, and Mary Schultz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

The defendants, Herbert McGrath and Keith McGrath, were jointly tried in a case initiated before a jury in the circuit court of Cook County. Following the presentation of the State's case, however, the defendants waived their right to a jury trial. Herbert McGrath had been charged with two counts of attempted murder, four counts of aggravated battery and two counts of armed violence. Keith Mc-Grath had been charged with one count of attempted murder, four counts of aggravated battery and one count of armed violence. The charges brought against the defendants arose from an altercation which had occurred on March 15, 1986, when the defendants were attacked by six men. The circuit court found Herbert McGrath guilty of armed violence and one count of aggravated battery. The court sentenced him to six years' imprisonment on the armed violence count and three years' imprisonment on the aggravated battery count, to run concurrently with the six-year sentence. Keith McGrath was found guilty of one count of aggravated battery and was sentenced to four years' imprisonment. Defendants now appeal their convictions to this court.

THE TRIAL

At trial, the State presented the testimony of five of the six attackers. The first witness was Robert Piunti, who testified that on the night of March 15, 1986, he was at the Jubilation Lounge (Jubilation), a bar in Chicago Heights, Illinois. Piunti said that around 3 a.m., he was standing in a hallway at the Jubilation when the defendants walked up to him, called him a "homo," and began hitting him in the face. Piunti claimed that he had never seen the defendants before this incident. Piunti stated that the defendants continued hitting him until two bouncers broke up the fight. The bouncers then escorted Piunti outside the bar.

According to Piunti, after the bouncers took him outside the bar,

he sat in the parking lot with his friend, David Nardi, until he saw the defendants leave the bar. Piunti decided to follow the defendants in his car, a Pontiac Trans Am, because he was angry with them. Nardi, Joe Ciarrocchi, George Friel and Elias Michalopoulous rode with Piunti, and John Ciarrocchi followed in his own car. Piunti said that the defendants each drove separate cars, so he followed only one of them. Piunti followed the car from Halsted Street to 174th Street and then to Wooded Path Drive in East Hazel Crest, Illinois. Piunti said that he lost the car when he turned onto Wooded Path Drive, so he drove a short distance down the street and then turned around and came back. When he turned around, he saw the defendants standing in the street, so he parked his car and began walking toward them. Piunti testified that when he was 10 to 12 feet away from Herbert McGrath, Herbert fired a gun and hit him above the ankle on his right leg. Piunti then ran toward a nearby apartment building and saw Herbert walk over to his Trans Am and shoot out the back window. At that point, Piunti said, the police arrived and took him to Ingalls Memorial Hospital, where his leg was X-rayed, cleaned and bandaged.

On cross-examination, Piunti admitted that he and his friends may have followed the defendants in order to seek revenge. Further, Piunti testified that the police were at the Jubilation after the fight broke out, but admitted that he did not complain to the police about what had happened in the bar. Piunti also admitted that it was possible that when he was following the car driven by one of the defendants, he may have pulled up alongside the car and exchanged words with the defendant, and admitted that someone in his car might have told the defendant, "You're dead meat." Piunti denied, however, that he "wedged" his car between the defendants' cars to separate them, and also denied that he knew when he drove down Wooded Path Drive that one defendant had driven into an apartment complex parking lot and, therefore, parked his car in front of the entrance so that the other defendant could not get into the lot. Piunti said he did not recall hearing the defendants telling him to go away because they did not want any trouble. Piunti also stated that he did not know what happened to his friends during the altercation.

In addition, Piunti admitted on cross-examination that he did not see Herbert aim his gun, and did not see where the shot that hit him came from. Piunti stated that there were no streetlights on Wooded Path Drive, and consequently, it was very dark. Piunti then testified that as he was walking toward the defendants, before Herbert shot him, he did not feel threatened and was still angry, and may have

even called the defendants "mother-fuckers." Piunti also conceded that as he was following the defendants, he and his friends might have discussed what they would do to the defendants and might have discussed "kicking some butt." Finally, Piunti said that as he was approaching the defendants, he did not see anything in their hands because it was dark.

Joe Ciarrocchi testified as the State's next witness. Joe testified that on March 15, 1986, around 3:20 a.m., he was in Piunti's black Trans Am along with Piunti, Nardi, Friel and Michalopoulous. Joe said that they were following a car because the driver had attacked Piunti earlier, at the Jubilation. Joe stated that they followed the car from Halsted Street to 174th Street and then onto Wooded Path Drive. Joe testified that when they reached Wooded Path Drive, they drove a short distance and then turned around and parked the car. Joe said that Piunti got out of the car at this point, so he also got out of the car. Joe claimed that he and Piunti ran across the street because they saw the defendants standing there and, as they approached the defendants, Herbert McGrath pulled a gun and fired a few shots in their general direction. Joe heard someone say, "I got hit."

Joe then told the court that when he heard someone yell that he had been hit, he froze because he was frightened, and Keith McGrath then approached him with some kind of black stick or club. Joe testified that Keith then hit him in the back of the head and the knees with the club. Joe said he did not fall to the ground, but was dizzy and staggered back toward Piunti's car. When he reached the car, he saw that Keith was also walking toward the car, so he said to Keith, "You don't have to hit me again, we're leaving," and indicated that he was just waiting for the person with the car keys. Joe claimed that Keith did not respond and instead hit the window on the driver's side of the car with the club. Keith also hit Joe in the forehead with the club. Joe testified that he did not remember anything after that until he woke up in an ambulance. Joe said that he was taken to Ingalls Memorial Hospital and received nine stitches in his forehead, and had a total of seven lumps on the back of his head, five injuries to his face, and a bruise on the lower right side on his back.

On cross-examination, Joe testified that he had seen the defendants at Jubilation approximately two weeks before the March 15 incident, but said he did not know them personally and had never spoken with them. Joe conceded that he may have followed the defendants "to do justice, to even the score" for the defendants' attack on Piunti. Joe also admitted that he got out of the car with Piunti and walked

toward the defendants in order to get into a fight, but he denied that he called the defendants "mother-fuckers."

Joe further testified on cross-examination that he heard two shots fired that night, but claimed he never heard any warning shots. Joe denied that he heard someone say, "Please leave, we don't want any trouble" or "I've got a gun, go away, get out of here." Joe admitted that Keith may have had reason to hit him because he and his friends were following Keith, but said that Keith was justified in using his fists only, not a nightstick or club. Joe also said that he did not remember seeing George Friel kicking a girl named Dawn Brenner. Finally, Joe said that it was dark in the parking lot where the altercation took place, but that he would be able to distinguish whether someone was holding a gun.

David Nardi testified as the State's next witness. Nardi said that on March 15, 1986, at 3 a.m., he was at the Jubilation and heard that his friend, Piunti, had been hit. On that date, Nardi testified, he was six feet three inches tall and weighed 280 pounds. Nardi stated that he left the Jubilation with Piunti, Friel, Michalopoulous and Joe Ciarrocchi in Piunti's car and drove down Halsted Street to 174th Street and then to Wooded Path Drive. Nardi testified that they were following a car but lost it on Wooded Path Drive, so they turned their car around and stopped. Nardi said that when they were stopped on Wooded Path Drive, he heard one gunshot and got out of the car. When he was exiting the car, he was nicked in the knee by a bullet, so he got back into the car. Nardi then heard another shot and saw Keith McGrath walk up to the car and put a black club through the passenger's side window. Nardi said he then jumped into the driver's seat and drove off to find a police officer. Nardi found an officer and told him that there had been a shooting, so the officer followed him back to the scene. When they arrived back at the scene, Nardi said, he saw Joe Ciarrocchi lying on the ground in a pool of blood. Nardi also testified that he was later taken to Ingalls Memorial Hospital, where his knee was cleaned and bandaged.

On cross-examination, Nardi denied that there was any conversation about "kicking the butts" of the defendants for hitting Piunti. Nardi further claimed that Piunti never parked his car so that it was blocking the car behind him and said that he never got out of Piunti's car and tried to stop that car. Nardi did admit, however, that when he located a police officer, he never told the officer that he had been shot. Nardi also said that it was very dark in the apartment complex parking lot. Nardi testified that it was so dark, he would barely be able to distinguish whether someone was standing across the street

and would not be able to tell what color clothing a person was wearing.

The State presented George Friel as its fourth witness. Friel said that on March 15, 1986, at 3:30 a.m., he was in the Jubilation parking lot and got into Piunti's car along with Piunti, Nardi and Michalopoulous. Friel stated that they followed the defendants from Halsted Street to 174th Street and then to Wooded Path Drive, where they turned their car around and parked it. Friel testified that when they parked on Wooded Path Drive, he heard a sound like a firecracker and heard someone say they had a gun. Friel said that everyone then got out of Piunti's car. Friel positioned himself by Piunti's car so that he would not get shot and saw Keith McGrath beating Joe Ciarrocchi with a black stick. Friel said he saw Joe fall to the ground and saw Keith continue to beat Joe with the stick and kick him. Friel said that Keith did not stop beating Joe until he saw blood coming from Joe's forehead. Friel testified that he then went over to Joe, who was shaking and unconscious and was bleeding from the head.

Next, according to Friel's testimony, when he was trying to help Joe, he saw two girls, Jeanne Garriby and Keith's girl friend, Dawn, fighting on the corner and went over to break up the fight. Friel said that as he tried to grab Jeanne off Dawn, Keith McGrath struck him in the back of the head with a stick. Friel stated that Herbert McGrath then came up to him, put a gun to his forehead and said, "You're going to die." Dawn's sister, Kelly, then ran over to Herbert and said "Don't do it. He is trying to break up the fight." Friel testified that Herbert then said, "You're lucky," and walked away. At this point, the police arrived.

Friel admitted on cross-examination that he and his friends wanted to beat up the defendants for hitting Piunti and that they discussed beating up the defendants when they were driving in Piunti's car. Friel also said that he heard at least four shots that evening. Friel denied, however, that he was kicking Dawn in the back when Keith hit him. Finally, Friel testified that the area where the altercation took place was not well lit, although he claimed he would have been able to tell what color clothing someone was wearing.

The State's fifth witness was John Ciarrocchi, who testified that he saw the defendants at the Jubilation on March 15, 1986, and had a conversation with them concerning an incident that had happened about two weeks earlier at the Contempo bar, where Keith had allegedly hit a girl that John knew. Later, John said, he heard that the defendants had hit Piunti, so he went outside the bar and saw Piunti and Nardi. The police arrived then and tried to get everyone out of

the parking lot. John claimed that the police officers separated Herbert and Keith McGrath and made Keith leave the parking lot first. John saw Piunti start his car and saw a number of people get into it, so John decided to follow Piunti's car. John testified that he followed Piunti's car down Halsted Street, where they passed the car driven by Herbert McGrath. The cars then turned onto 174th Street and from 174th Street turned onto Wooded Path Drive. John claimed he was following Piunti because he knew that there would probably be another altercation and he wanted to prevent that.

John stated that he drove down Wooded Path Drive and then turned around. When he had turned around and was driving back toward 174th Street, Herbert McGrath came out from behind his car and hit his windshield with a bat or club. John then drove ahead a bit and stopped his car. When John got out of his car, he saw his brother Joe crossing the street and saw Herbert strike Joe with a club. John then heard gunshots and heard the defendants scream at them to get out of there and leave them alone because they did not want any trouble. John said that one or two of the gunshots were fired into the air and one was fired toward the ground in the direction of Piunti's Trans Am. John testified that he then saw Keith go back toward Joe and hit him with the club again. When John went over to Joe, Joe was lying in a pool of blood. Shortly thereafter, the paramedics and police arrived.

John testified on cross-examination that he knew of the defendants before the March 15 incident because Herbert McGrath was dating his ex-girl friend, Robin Haskins. John denied telling the defendants when they were at Jubilation that he was going to beat them up for the incident at the Contempo bar. John claimed that all he told the defendants was that he wanted to hear their side of the story. John admitted that as he was following the defendants on Halsted Street, he tried to keep the defendants' cars separate because he had heard that the defendants would not fight separately. John further said that he did not recall the lighting conditions that evening, although he said it was not bright enough for him to identify the defendants.

The State's last witness was Officer Roy Janich. Janich testified that he was an East Hazel Crest police officer and on March 15, 1986, around 3:50 a.m., was called to 174th and Wooded Path Drive because he had received a report that there had been a shooting there. When he arrived on the scene, Janich saw several people standing around Joe Ciarrocchi, who was lying on the ground and was bleeding severely from the head. Janich said he was told that there had been a shooting involving two brothers, and said that the men pointed out

the defendants' vehicles as they were leaving the area, so he pursued their vehicles. Janich testified that he passed the vehicle driven by Herbert McGrath, but did not stop Herbert because there was a woman and small child in the car, and the description the men had given him of the defendants did not include a woman and child. Janich then followed the other car and pulled it over. Keith McGrath was driving that car. Keith exited his car, and when Janich looked inside the vehicle, he saw a police-style fiberglass baton and a leather gun holster. Janich then took Keith into custody and gave him his *Miranda* warnings.

At the police station, Janich said, Keith indicated that he understood his *Miranda* rights. Keith then told Janich that there had been an altercation at the Jubilation bar in Chicago Heights, and that the altercation had continued at 174th Street and Wooded Path Drive in East Hazel Crest, in the parking lot of the apartment complex where Keith lived. Keith said that when he and his brother, Herbert, arrived at his apartment, Herbert got out of his car and broke the windshield on one of the attacker's cars with a club, and then handed the club to Keith. Keith admitted hitting Joe Ciarrocchi with the club, but denied that he hit Joe when he was down. Keith also said that Herbert pulled out a handgun and fired several rounds, wounding two of the attackers. Keith then told Janich where Herbert lived and said that Janich could probably find Herbert there.

Janich testified that he then proceeded to Herbert's apartment and took Herbert into custody. Janich read Herbert his *Miranda* rights, and Herbert agreed to speak with Janich. Herbert told Janich that there had been an earlier incident at the Jubilation and that the attackers had followed him and his brother to Wooded Path Drive. Herbert told Janich that when he and Keith arrived at Wooded Path Drive, they exited their vehicles. Herbert grabbed his nightstick and broke out the windshield of John Ciarrocchi's car, and then handed the nightstick to Keith. Janich testified that Herbert told him that he grabbed his .22 caliber handgun and fired two shots into the air and told everyone to stay back. Herbert then shot two of the victims in the leg and fired one shot into the rear window of Piunti's vehicle.

On cross-examination, Janich said that when he first arrived on the scene, he assumed that Joe Ciarrocchi had been shot, because no one mentioned a beating with a club at that time. Janich also said that he was the first officer on the scene and that none of the men told him then that they had been shot. Janich further revealed that when he had interviewed Herbert McGrath at the police station, Herbert told him that when he arrived at Wooded Path Drive, several of

the attackers came after him so he fired two gunshots into the air. Janich admitted that based on his interviews with the six men, he believed that they "were looking for trouble" when they followed the defendants on March 15, 1986. Janich also said that he did not remember Friel ever telling him that Herbert put a gun to his forehead, and said that if Friel had told him that, he would have put it in his police report. In addition, Janich said that Friel told him he could not be positive that it was Keith McGrath that struck him in the back of the head with the club. Finally, Janich stated that in his report, he wrote that Nardi identified Keith McGrath as the one who damaged Piunti's car, but that Nardi told him that he could not identify Keith as the one who struck Joe Ciarrocchi.

Following Janich's testimony, the State rested. The defendants moved for a directed finding, which the trial court denied. The defendants then waived their right to a jury trial, and the case proceeded as a bench trial. The defendants then presented their case.

Herbert McGrath testified in his own defense and said that in March 1986, he was employed at the Diamond Detective Agency (Diamond) and, as part of his employment, carried a nightstick. Herbert said that the nightstick removed from the car by Officer Janich was not his, but was probably his brother's, because Keith was also employed by Diamond in March 1986. Herbert testified that on March 15, 1986, he went to the Jubilation around 12:30 a.m. with his brother, Keith, Keith's girl friend, Dawn Brenner, and Dawn's sister, Kelly Jordan. When they arrived at Jubilation, Herbert said, the girls went into the washroom while Herbert and Keith remained in the hallway nearby. Herbert said that John Ciarrocchi, whom he had never seen before, walked up to them and asked if they were the McGraths. When Herbert said yes, John told Herbert that he wanted to know about the incident at the Contempo bar two weeks earlier. Herbert told John to talk to Keith, because Keith was the one involved in that incident. John then said that he wanted to hear the McGraths' side of the story.

John then explained to the McGraths that Debbie Friel, George's sister, wanted John and his friends to beat up the McGraths because of the Contempo incident. However, after hearing Keith's side of the story, John told the McGraths that nothing was going to happen to them. Herbert said that nothing else happened until he and Keith were preparing to leave the bar, around 3 a.m. Herbert said that he was walking out with Robin Haskins when Keith said to him, "[t]here's some guy that said you and I were 'homos'." Herbert said that when he turned to see who Keith was referring to, he was "cold-

cocked" by someone and then was jumped on by several people, including someone he later identified as Piunti. Herbert said his friend, Nick Matela, a bouncer at Jubilation, then pulled Piunti off Herbert's back. Herbert testified that he was led to the washroom because his nose was bleeding, and as he was walking, he saw someone, later identified as Nardi, yelling to Keith, "I'm going to kill you. I'm going to kill you."

After washing his face, Herbert testified, the bouncers had him wait in the vestibule of the bar until those who had attacked him left the bar. When the bouncers told them it was safe to leave, Herbert said, he left the bar with Robin Haskins and Debbie Ehringer, and his brother left with Dawn Brenner and Kelly Jordan. Herbert directed Debbie Ehringer, who was driving, to follow Keith's car out of the parking lot because they were all going to Keith's apartment. Herbert testified that as they were driving down Halsted Street, a black Trans Am pulled out behind Keith's car. Herbert said that when they turned down 174th Street, he could not see Keith's car anymore and he became anxious, so he told Debbie to go directly to Keith's apartment. Herbert said that before they could reach Keith's apartment, he saw a black Trans Am parked diagonally across the street and saw Nardi standing in front of the car waving, trying to get Debbie to stop her car. Herbert said he instructed Debbie to keep going because he saw several people filing out of the car and feared for his life. Herbert stated that Debbie then drove down Wooded Path Drive, where he got out of the car. Herbert claimed that he then told the girls to call the police.

Herbert then testified that he saw Keith standing next to his car, which was parked in the apartment complex parking lot. Herbert said that his car had been parked there all evening. Herbert noticed that Keith had a nightstick in his hand and said that Keith threw the nightstick to him. Herbert testified that he told Keith there was a gun in a gym bag in his car. Herbert instructed Keith to get the gun out of his car. At this point, Herbert said, he was very scared. Herbert then chased the Trans Am and tried to hit the front hood in order to get the car out of the parking lot. Herbert said that the car left the parking lot, but then another car swerved at him out of nowhere, and, as he jumped out of its way, he hit its windshield with his nightstick. At this point, the occupants of the Trans Am began walking toward him, later identified as Nardi, Piunti and Joe Ciarrocchi. Herbert said he could not be certain whether Michalopoulous was there.

Herbert testified that he then began running toward Keith's apartment. The attackers chased him saying, "Let's get him," and

yelling that he was "dead meat" and that they were going to kill him. When Herbert reached the corner, he said, he saw Keith standing there with his gun, so he asked Keith to give it to him. Keith then gave him the gun, and he gave Keith the nightstick. Herbert said that he then told the attackers, "It's over. Go home. I have a gun." Herbert stated that the attackers were yelling obscenities at him, so he fired two warning shots into the air and told them to leave. According to Herbert, three of the attackers continued running at him, so he fired the gun at the ground. However, Herbert denied that he aimed the gun at anyone. Herbert said that the group scattered, but then Nardi and someone else came toward him, so he fired another shot into the ground and this time everybody scattered.

Herbert next testified that he and Keith went over to the black Trans Am to tell everyone to leave. Nardi tried to swing at Herbert, so Keith took a swing at Nardi with the club, but missed and hit the windshield of the Trans Am. Herbert and Keith then saw Dawn Brenner fighting with another girl, and saw Friel kicking Dawn, so Keith went over and began kicking Friel. Keith then grabbed Dawn, and as Keith, Herbert and Dawn were walking away, Herbert was jumped by someone. When he was jumped, Herbert claimed, he still had his gun in his right hand, and the gun went off into the back window of the Trans Am. Herbert then started running, and Joe Ciarrocchi came after him, so Herbert hit Joe, causing Joe to fall. Herbert said that two more people jumped on him. As he was fighting those two off, Herbert saw Joe start to get up, so he walked over and kicked Joe in the head. Herbert testified that Joe went down again and, at this point, the fight stopped. Herbert said that he then left the scene in his car with Dawn Brenner's baby and a babysitter. Herbert said he made it back to his apartment and that the police did not come until the morning.

On cross-examination, Herbert testified that none of the attackers showed any weapons to him at Jubilation or as they were driving down Halsted Street, but Herbert said that when they were on Halsted, the attackers tried to run him off the road. Herbert also explained that as he was driving, he did not try to find a phone because he was worried about his brother Keith.

Dawn Brenner was the next witness called to testify for the defendants. Dawn said that on March 15, 1986, she lived with the defendant, Keith McGrath. That evening, Dawn went to Jubilation with Keith, her sister, Kelly Jordan, and Herbert McGrath. Dawn said that when they were at Jubilation, as she was coming out of the women's washroom, she saw a man talking to Herbert and Keith. She

heard the man ask Keith if he had hit a girl in the Contempo bar a couple of weeks earlier, and she also heard Keith tell the man that he did not do it. Dawn said that she told the man that she and the girl had been fighting and that Keith had pulled them apart, but when he did so, both girls hit their heads on the cement.

Dawn then testified that she left Jubilation several hours later with Keith and her sister. She said that Herbert McGrath left at the same time with Robin Haskins and Debbie Ehringer. Herbert and the girls planned to follow them to Keith and Dawn's apartment in East Hazel Crest. As they were driving down Halsted Street, Dawn said, some cars pulled out and tried to separate Herbert's and Keith's cars. The cars continued to follow them as they drove to the apartment complex. When they parked their cars, Keith told Kelly to go upstairs and call the police and told Dawn to stay where she was. Dawn said she then walked toward a large man, later identified as Nardi, and told him to leave because they did not want any trouble and because she had a baby there. Dawn claimed that Nardi replied, "Get the hell out of my way, you fucking bitch," and pushed her into Keith. Dawn testified that she then walked over to Debbie Friel and Debbie's brother, George, because she knew them. However, Dawn then got into a fight with one of Debbie's friends. Dawn said that while she was fighting with that girl, George Friel kicked her at least twice, but stopped when Keith came over. Dawn stated that soon after that, they heard police sirens and ran toward her apartment.

Keith McGrath also testified in his own defense and said that on March 15, 1986, he lived with Dawn Brenner and her sister, Kelly Jordan, in East Hazel Crest. On that evening, the three of them went to Jubilation, along with Keith's brother, Herbert. Keith testified that when they arrived at Jubilation, Dawn and Kelly went into the washroom and he and Herbert waited outside. As they were waiting, John Ciarrocchi walked up and asked him if he had been involved in the incident at Contempo. Keith explained to John what had happened and, Keith said, John walked away.

Later, Keith testified, as they were leaving the bar, someone Keith later determined was Piunti called him a "homo." Keith then heard a commotion behind him and saw a number of people on top of Herbert, although he never saw anyone hit Herbert. At the same time, Keith said, Nardi screamed at him that he was going to kill him. The police then made everyone leave the parking lot, but had the McGraths wait to leave until everyone else had gone. Keith left with Dawn and Kelly and decided to meet Herbert at his apartment. Keith said that as he was driving home down Halsted Street, three cars, in-

cluding a black Trans Am, began following him and tried to separate him from his brother. Keith testified that when he pulled into his apartment complex parking lot, he told Kelly to run upstairs and call the police, and told Dawn to stay where she was. Keith said that he then ran upstairs to let Kelly into the apartment, since he had the keys, and immediately ran back downstairs.

Next, Keith said, he got his nightstick and threw it to his brother, Herbert, who also had arrived by this time. Keith said Herbert told him to get his gun from the gym bag in his car. Keith retrieved the gun and switched weapons with Herbert. At this point, Nardi pushed Dawn, and then came after Keith, but stopped before he reached him and took off after Herbert. Keith testified that Joe Ciarrocchi then came running at him, so he took a swing at Joe. Keith said that he may have hit Joe a few times, but said that Joe also hit him a few times. At the same time, Keith said, he heard Herbert telling the attackers to get out of there, and heard Herbert fire some warning shots.

After his confrontation with Joe Ciarrocchi, Keith testified that he ran toward the black Trans Am because his brother was over there. Keith said that Nardi took a swing at him so he hit back, but missed Nardi and instead hit the passenger window on the Trans Am, shattering it. Keith then heard his brother yell that Dawn was being kicked. Keith said he saw Friel kicking Dawn, so he kicked Friel and pushed him away. Keith pulled Dawn off the ground and ran toward Herbert because he saw three people hanging onto Herbert's back. Keith said, however, that by the time he reached Herbert, the fighting had stopped. On cross-examination, Keith denied hitting Friel with the nightstick in order to stop him from kicking Dawn.

The defendants also called Robin Haskins to testify. Robin testified that she was dating Herbert McGrath and that they had their first date on March 15, 1986. Robin also said that before March 15, 1986, she had dated John Ciarrocchi. Robin stated that she went to Jubilation on March 15 with her friend, Debbie Ehringer, because she had told Herbert she would meet him there. Robin left Jubilation around 3 a.m. with Herbert and Debbie. As they were walking out, Robin saw Piunti hit Herbert in the face. Robin said that a fight broke out, but she eventually left with Herbert and Debbie in Debbie's car. According to Robin, as they were driving down Halsted Street toward Keith and Dawn's apartment, John Ciarrrocchi pulled out onto Halsted and tried to hit Debbie's car. Robin also saw Piunti's car ahead of them, following Keith. Robin stated that when they turned off Halsted Street, they saw that Piunti's Trans Am was blocking the

street and also saw Nardi standing outside of the car waving his hands, so they drove off the road to avoid them. Robin said that when they reached the apartment complex, Herbert told her to call the police.

Next, Robin said she knocked on an apartment door and told the occupant to call the police and then ran back outside, where she heard a shot. Robin testified that Joe Ciarrocchi then walked up to her and said, "Look what your buddy did to me," and she noticed that Joe's head was bleeding. Joe then walked away from her and ran toward Herbert. Robin saw Joe fall and try to get back up and, she said, as he tried to get back up, Herbert kicked him. Robin said that Joe fell down again and there was no further fighting after that. On cross-examination, Robin said that she only heard one shot during the altercation.

Defendants' last witness was Nick Matela, who testified that on March 15, 1986, he was employed as a bouncer at Jubilation. Around 3 a.m.' on that date, Matela said, a fight broke out as the defendants, whom he had known for approximately 12 years, were leaving. Matela said that he saw someone throw a punch, but could not say for certain whether Herbert was hit. Matela did say, however, that he was certain that Herbert never hit anyone. Matela testified that he then saw someone holding Herbert and he heard Herbert say, "Get him off of me, get him off of me." The bouncers then broke up the fight. Matela also remembered hearing a "big, heavy-set kid" call Herbert a "mother fucker" and say "I will kill you, Herbie, I will kill you." Following Matela's testimony, the defense rested.

As noted, the trial court found Herbert guilty of armed violence and aggravated battery and found Keith McGrath guilty of aggravated battery, stating that the case against the defendants turned on the credibility of the witnesses. The court held that although there were discrepancies in the testimony of the witnesses for both sides, the State's witnesses were more credible. The court concluded that the attackers were the original aggressors here, but that the defendants became the aggressors when they reached Wooded Path Drive, noting that Keith had time to run upstairs and unlock the apartment door for Kelly, Herbert had time to get a nightstick and tell Keith to get his gun, and both defendants had time to move out of the immediate vicinity of the apartment complex and into the parking lot. At that point, the court said, there was no threat of great bodily harm or imminent death to the defendants, so the use of force by the defendants was not justified.

THE OPINION

On appeal, the defendants contend that the State failed to prove them guilty beyond a reasonable doubt. The defendants assert that they were justified in using force to protect themselves under the circumstances here. Defendants note that they were pursued to their apartment complex at 3 a.m. by six angry men who had threatened them earlier. Defendants argue that they reasonably believed that they were in danger of great bodily harm under these conditions since it was dark and they could not determine whether their attackers were armed. Also, defendants say, they had to make split-second judgments here because they were outnumbered by their attackers and everything happened very quickly.

The State, on the other hand, argues that the trial court properly held that the defendants did not act in self-defense and, in fact, became the aggressors. In addition, the State contends that the amount of force used by the defendants was excessive because the conduct of the six alleged attackers was insufficient to create a reasonable belief on the part of the defendants that they were in danger of death or great bodily harm. Accordingly, the State maintains that the defendants were proven guilty beyond a reasonable doubt.

 A person is justified in using force against another "when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against each other's imminent use of unlawful force," and, in addition, a person is justified in using force "intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) In order to establish a claim of self-defense, then, a defendant must show that unlawful force was threatened against him and he believed the danger of harm was imminent, that he was not the aggressor, that the force used was necessary to avert the danger threatened against him, and that the amount of force used was necessary. (*People v. Alcazar* (1988), 173 Ill. App. 3d 344, 349, 527 N.E.2d 325, 328; *People v. Lenzi* (1976), 41 Ill. App. 3d 825, 834, 355 N.E.2d 153, 162.) Once a defendant has established these elements, however, the burden then shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. (*Alcazar*, 173 Ill. App. 3d at 349, 527 N.E.2d at 328; *People v. Tirrell* (1980), 87 Ill. App. 3d 511, 517, 408 N.E.2d 1202, 1206.) The State must show that the defendant's belief that he was in danger of imminent harm was unreasonable. (*Alcazar*, 173 Ill. App. 3d at 349, 527 N.E.2d at 328.) The test is what the defendant, as a reasonable man,

believed under the circumstances, not what a fact finder thinks a reasonable man would believe; thus, if the defendant's belief is reasonable, he may use deadly force to protect himself even if he is mistaken as to the danger. *People v. White* (1980), 87 Ill. App. 3d 321, 323, 409 N.E.2d 73, 74; *Lenzi*, 41 Ill. App. 3d at 835, 355 N.E.2d at 162.

Here, the defendants contend that they did provide evidence in support of each of the elements necessary to a finding of self-defense. Defendants note that they were not the aggressors, since their attackers admitted that they followed the defendants from the Jubilation to their apartment complex in order to retaliate against them for the incident at the Jubilation. Defendants also contend that the actions of the six men caused them to reasonably believe that unlawful force was threatened against them and that the danger of harm was imminent, since the attackers outnumbered the defendants six against two and there was some testimony, including the testimony of one of the State's witnesses, that the attackers tried to separate the defendants' cars as they were driving toward Keith's apartment. Further, as noted earlier, these events happened in a matter of minutes, at 3 a.m., in a dark parking lot.

The defendants also allege that the force they used was necessary to avert the danger threatened against them and the amount of force used was necessary, since, according to the defendants' testimony, their attackers continued to come after them even after Herbert had fired two warning shots. At this point, the defendants did not know whether their attackers were armed. Further, the defendants argue that the force used was not excessive since there was no testimony that Herbert actually aimed the gun at anyone. Finally, the defendants argue that merely because they left the immediate area of the apartment complex, armed themselves, and stood their ground as their attackers advanced toward them, does not turn them into the aggressors because they did not have a duty to retreat.

In response, the State concedes that the six men were the original aggressors. Nonetheless, the State argues that once the parties reached the apartment complex, the defendants became the aggressors. In support of this argument, the State claims: Herbert was unprovoked when he hit the windshield of John Ciarrocchi's car; Piunti testified that he saw Herbert point the gun at him; Friel testified that Keith kept hitting Joe Ciarrocchi with the nightstick until he saw blood coming from Joe's forehead; the six men were unarmed; there was no credible testimony that the men attacked the defendants; and Herbert's behavior was inconsistent with the behavior of one who

feared for his life because Herbert never tried to call a police officer or locate an officer on his way to Keith's apartment.

■ A reviewing court will not substitute its judgment for that of the trial court and will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt concerning the defendant's guilt. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903; *People v. Molstad* (1984), 101 Ill. 2d 128, 133, 461 N.E.2d 398, 401.) When considering a challenge to the sufficiency of the evidence of a defendant's guilt, a reviewing court will not retry the defendant, because determinations concerning the credibility of witnesses, the weight to be given their testimony and the reasonable inferences to be drawn from the evidence presented are responsibilities of the trial court where a jury is waived. (*Jimerson*, 127 Ill. 2d at 43, 535 N.E.2d at 903; *Molstad*, 101 Ill. 2d at 133, 461 N.E.2d at 401; *People v. Stokes* (1989), 185 Ill. App. 3d 643, 658-59, 541 N.E.2d 1129, 1139.) The relevant inquiry on review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jimerson*, 127 Ill. 2d at 43-44, 535 N.E.2d at 903.

■ We find that the evidence presented here was insufficient to support the trial court's conclusion that the defendants were the aggressors and were not acting in self-defense. Viewing the evidence in a light most favorable to the prosecution, we cannot say that the defendants were proven guilty beyond a reasonable doubt. The record is clear that the six attackers had made previous threats and had pursued the defendants to Keith's place of residence, even though they had an opportunity to file a complaint against the defendants with the police while they were at the Jubilation. When the men arrived at Keith's apartment, they advanced toward the defendants, in the dark, in a threatening manner, with an avowed present determination and intent to inflict physical harm. The aggressive behavior of the six attackers was deterred only when the defendants defended themselves in a manner deemed necessary at the time, while the defendants were fearful and under stress.

We further hold that the evidence was insufficient to support the trial court's conclusion that the defendants became the aggressors merely because Keith was able to run upstairs and unlock his apartment door. The defendants' actions were consistent with their belief that unlawful force was threatened against them and that the danger of harm was imminent. Both defendants testified that when they arrived at the apartment complex, they told their female companions to

call the police. Also, when Keith was upstairs, Herbert was left alone to fight six men, so it was reasonable for Keith to return to the parking lot to help Herbert defend himself. Moreover, the defendants testified that Dawn Brenner's baby was inside Keith's apartment, so it was reasonable for Keith to want to keep the attackers away from the apartment.

We also believe that the evidence supports our conclusion that the defendants' use of force was necessary to avert the danger and was not excessive. The defendants were outnumbered by their attackers, one of whom was six feet three inches tall and weighed 280 pounds. The events took place in a dark parking lot in the early morning hours, and the defendants did not know whether their attackers had weapons. We find Herbert's action in yelling at the attackers to leave him alone because he had a gun to be consistent with his testimony that he feared for his life and that he was using the gun only to scare the attackers away. It was only when the presence of the gun did not deter the attackers that Herbert fired two shots into the air. When even the warning shots did not deter the attack, Herbert fired two shots into the ground. The evidence supports Herbert's testimony that he did not aim his gun at the attackers but instead fired two shots into the ground, since both of the men who were hit were hit in the lower leg and received wounds that required only cleaning and bandaging. Under the circumstances here, considering the fact that the events took place in a matter of minutes as six men advanced on two men, we cannot say that the defendants acted unreasonably. When a person has reasonable grounds to believe that he is in danger of death or great bodily harm, he is not required to use infallible judgment since it would be unreasonable to require one to make such an exacting decision in the space of a few seconds while fearful and under stress. *White*, 87 Ill. App. 3d at 323, 409 N.E.2d at 75.

In support of its argument that the trial court properly found the defendants guilty, the State relies upon this court's decision in *People v. Alcazar* (1988), 173 Ill. App. 3d 334, 527 N.E.2d 355. We find that case to be distinguishable from the present case. In *Alcazar*, this court rejected the defendant's claim that he had killed a man in self-defense. The court there held that the defendant became the aggressor because: (1) the defendant backed away from the victim only after taunting the victim and brandishing a shotgun; (2) the defendant went into his apartment to get his shotgun and then returned to continue the verbal altercation; (3) when inside his apartment, the defendant stood ready to fire at the victim if the victim entered the building; and (4) the defendant was not outnumbered. In contrast, the defend-

ants here did not provoke the attackers and were outnumbered. Further, Keith did not go inside his apartment to arm himself and, when the defendants did arm themselves, they did not attack the six men until the men started coming after them. Finally, the defendants here did not use deadly force, but only used that force necessary under the circumstances.

The State also cites this court's decision in *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290, for the principle that whether a defendant acted in self-defense is a question of fact for the trial court and, where the evidence is contradictory, the reviewing court should not substitute its judgment for that of the trial court. However, we also find *Zolidis* to be distinguishable from the present case. In *Zolidis*, this court rejected the defendant's claim that he had acted in self-defense because the evidence showed that he had stabbed the victim 17 times. Clearly, stabbing a victim 17 times is excessive and cannot logically be considered an act of self-defense. Conversely, in this case, the defendants used only that force necessary to repel the attackers and to protect themselves, and stopped fighting when the men stopped their attack on them.

Upon careful review of the record, then, keeping in mind that the trial court's factual determinations are entitled to great weight, we nonetheless conclude that the record does not support the trial court's finding that the defendants are guilty of armed violence and aggravated battery. When a careful examination of all the evidence presented to the trial court leaves the reviewing court with a substantial and well-grounded doubt of the defendants' guilt, the defendants' convictions cannot stand. (*Lenzi*, 41 Ill. App. 3d at 837, 355 N.E.2d at 163.) Moreover, since we hold that the defendants' convictions must be reversed, we need not reach the defendants' second issue on appeal, that the trial court erred in limiting the impeachment of John Ciarrocchi.

Accordingly, for all of the foregoing reasons, we reverse Herbert McGrath's convictions for armed violence and aggravated battery and vacate his sentences. We also reverse Keith McGrath's conviction for aggravated battery and vacate his sentence.

Judgments reversed.

MANNING, P.J., and BUCKLEY, J., concur.