THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KOL BALAJ, Defendant-Appellant.

First District (6th Division)   No. 1—91—0542

Opinion filed July 22, 1994.

James A. McCarron, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Laura L. Morrison, and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

After a bench trial, the defendant, Kol Balaj, was convicted of first degree murder and sentenced to the Illinois Department of Corrections for 30 years. He first contends that he was not proved guilty beyond a reasonable doubt.

On March 29, 1987, Balaj, who is also named Skendor Krasnque, shot and killed off-duty Cook County Deputy Sheriff Branislaw Neskovic, who was known as Bronco. The shooting occurred at approximately 11 p.m. at the Kragujevac Restaurant in Chicago.

Hasan Advich testified that he and his wife met Enis and Enisa Cirkic at the restaurant. They sat at a table in the main room. Advich did not see the beginning of the fight between Bronco and Balaj;

he first saw them pushing each other in the hallway leading from the back of the restaurant to Lincoln Avenue. Then Bronco came out of the hallway into the main room holding one of his hands. Blood was dripping from Bronco's hands.

Balaj followed Bronco out of the hallway and into the restaurant; Balaj had a silver gun in his hands and said something in a language Advich could not understand. When Balaj spoke, Bronco turned to face Balaj and stood still while holding his hands up and away from his body. "The next thing, [Balaj], he points the gun straight to the chest, and he turned it down, sort of shaking the hand, then fire[d at Bronco.]" The cause of Bronco's death was a gunshot wound to the abdomen. After firing once at Bronco, Balaj picked up his jacket from a nearby table and "just walked out."

Enis and Enisa Cirkic saw Bronco follow Balaj into the hall; the men fought in the hallway. Then, Bronco walked into the main room holding his bleeding hands away from his body. Bronco "was walking very slowly" and Enis and Enisa heard him say, "Call the police." Next, Balaj walked into the main room holding a gun. Balaj said, "Don't move, nobody," and then spoke in a different language. When Balaj spoke, Enis saw Bronco turn to face Balaj and take several slow steps backwards away from Balaj. Bronco never moved his hands from the front of his body. After Bronco turned, Balaj walked toward Bronco and pointed the gun at Bronco's chest. Enis testified:

> "[Balaj] came close to five, six feet in front [of] Bronco, and he was holding the gun in his chest, you know, and *** he pulled the gun—pulled the trigger. He moved the gun down and he turned his head a little bit to the left side, and he pulled the trigger."

Mirjana Zagoroe, a waitress at the restaurant, testified that she had seen Bronco both drunk and sober, had observed him in arguments and was required to obtain the restaurant owner's permission before serving Bronco alcohol. Earlier in the evening on March 29, Zagoroe served Bronco cognac. The parties stipulated that at the time of his death Bronco's blood-alcohol level was .257.

Zagoroe saw Bronco walk toward Balaj's table and saw them "arguing or something." Zagoroe told the owner to call the police because she "was afraid" the men would fight. She explained that Bronco was Serbian while Balaj was Albanian; Albanians and Serbians "don't like each other." While she was asking the owner to call the police, Zagoroe saw Bronco running inside the main room holding his hands up and in front of his body. She ducked behind the bar until she heard one shot. After the shot, she looked over the bar and saw Balaj take his jacket and leave the restaurant.

Damjan Betinski testified on behalf of the defendant that he saw

Bronco "grab" Balaj's throat in the hallway. Bronco then left the hallway holding his hand, which was "a little bit like bleeding." Balaj followed Bronco into the main room "and he was pointing the gun in Bronco here about, and he was just, you know, the gun went down shaking his hands and he put the gun down and he shot the gun." Betinski admitted that he left the restaurant before the police arrived and never told the police what he had witnessed.

Another defense witness, Salih Mujezinovic, testified he was sitting with Balaj when Bronco approached their table and grabbed Balaj by the arm. Balaj and Bronco went into the hallway, where Bronco "took a gun" and told Balaj, "I shoot you." Bronco came out of the hallway holding one of his hands, which was bleeding. Balaj followed Bronco, and Bronco told Balaj in Yugoslavian "I f— you, I'll burn your mother" and "I'll f— your mother in Albania." Next, Mujezinovic "just saw a gun shaking and go down and shoot." Mujezinovic admitted that he did not wait to tell the police what he witnessed but explained that the police took him to the station later. He had pleaded guilty to possession of cocaine with intent to deliver in 1984.

Detective Johnson testified that, while Mujezinovic cooperated fully in helping the police find Balaj, he did not tell them Bronco grabbed Balaj's shoulder, did not mention any swearing or racial slurs by Bronco, did not explain that Bronco pulled a gun on Balaj in the hallway, and instead told them that he did not see the shooting.

Balaj testified that he saw Bronco near the musicians and noticed that Bronco was wearing a gun in his holster. Bronco approached Balaj, talked briefly with Mujezinovic, and said, "I am like old Serbian Czechnick."[1] Balaj testified that he could not explain the meaning of "Chetnik" well in English, but stated that "it's like against Albanians." According to Balaj, Serbians and Albanians "don't get along well." Bronco grabbed Balaj by the arm and told him, "You are going out." Balaj got up and started to leave the restaurant through the hall, but Bronco was behind him. Bronco told Balaj he would kill him, hit Balaj's head against the wall several times, and poked Balaj in the eyes. While they were fighting, he told Balaj, "I'm the bigger [Chetnik]." Balaj was dizzy and could not see, but nonetheless saw

---

[1]The court reporter has identified the spelling as phonetic. We believe the word is "Chetnik," which is defined as "a member of a Pan-Serbian movement or home-defense band for resistance to oppressors by guerrilla tactics." (Webster's Third New International Dictionary 386 (1981).) We take judicial notice that members of one of the large guerrilla forces that resisted the German army in Yugoslavia during World War II were sometimes identified as Chetniks.

Bronco "grab the gun." Balaj then reached for the gun with both hands and bit Bronco's finger.

When Balaj bit Bronco's finger, Bronco dropped the gun. Balaj reached down and picked up the gun as Bronco left the hallway. Balaj admitted that there was a door leading to Lincoln Avenue at one end of the hallway. Instead of leaving the restaurant, however, Balaj followed Bronco back into the main room. Balaj testified: "I went in and I told him, you know, don't move, nobody moves, *** I was very scared, I had my gun pointed at him, I couldn't see real good *** he was like moving, like twenty Broncos were in front of me." Balaj explained that his hands were shaking as he was holding the gun. He did not hear Bronco say any of the ethnic slurs Mujezinovic heard. He turned his head to look in the main room for Bronco's friend, because he was afraid the friend would shoot him, and he "was going to put the gun down and the gun went off." Balaj testified that he did not intend to fire the gun, but that he just wanted to "hold him, you know, to hold everybody there to the police come."

After he fired the gun, Balaj was "very shocked, scared" and believed that "somebody was going to shoot [him] there" so he picked up his jacket and keys and left the restaurant. He took the gun with him when he left the restaurant, but he could not remember what he did with the gun after leaving the restaurant. He went to his home and slept in his car in his garage. His wife told him that the police planned to kill him as soon as they found him. He fled from Chicago. He traveled through several States in America and many countries in Europe, and ultimately moved to Sweden.

Sergeant Carroll testified that in October 1989, he and other law enforcement officers went to Sweden, where they took custody of Balaj. The officers brought Balaj to Chicago, where they interviewed him with an assistant State's Attorney.

In rebuttal, Medical Examiner Chabliss testified that he could "totally exclude" a human bite as the cause of lacerations found on Bronco's hands. Assistant State's Attorney Cesario testified that when she interviewed Balaj, he did not tell her that he bit Bronco, that he was dizzy and could not see, that he was afraid of Bronco's friend, that he pointed the gun at Bronco just to "hold him" until the police arrived, or that he fired the gun accidentally. Instead, Balaj told Cesario that he fought with Bronco in the hallway, that Bronco hit him with the gun, that he followed Bronco into the main room, and that he shot Bronco when Bronco turned to face him in the main room.

At the close of the evidence, the trial judge followed a procedure which we encourage be followed in all bench trials where the defen-

dant is charged with first degree murder and where the defendant claims self-defense or accident or recklessness or killing in the heat of passion: the judge expressly considered second degree murder and involuntary manslaughter.[2] In findings which were commendably thorough, the judge found that the killing was not accidental or reckless, that the defendant did not act in self-defense, that the defendant did not act in the heat of passion and that he did not act with an unreasonable belief that his life was in danger or that he was about to suffer great bodily harm.

●1 The defendant's argument that he was not proved guilty beyond a reasonable doubt is hinged on his claim that the evidence establishes as a matter of law that he acted in self-defense. He makes the alternative argument that the evidence establishes, again as a matter of law, that he was guilty of second degree murder or that he was guilty of involuntary manslaughter. We reject all of these claims for the same reason: The judge, who heard and saw the witnesses, rejected them; and it is not our right to substitute our judgment for his under the facts of this case. (See *People v. McGrath* (1989), 193 Ill. App. 3d 12, 549 N.E.2d 843; *People v. Stanley* (1986), 146 Ill. App. 3d 912, 497 N.E. 2d 496.) Indeed, we agree with the trial judge's findings. Disinterested State witnesses testified that the defendant followed the deceased out of the hallway after the physical fight had ended, pointed a loaded gun at the decedent's chest while the decedent stood still with his arms outstretched, fired the gun and left the restaurant. He later fled to a foreign country.

The defendant next contends that he was denied effective assistance of counsel because his attorney did not raise the defense of self-defense and did not argue that the defendant was guilty of either second degree murder or involuntary manslaughter; he did not obtain an interpreter for one of the witnesses; he allegedly employed a convicted felon as an investigator; and allegedly did not thoroughly investigate the case.

●2 We first observe that the defendant did not testify that he fired the gun under any belief, reasonable or unreasonable, that his life was in danger or that he was about to suffer great bodily harm. He testified that the gun went off accidentally. As the trial judge stated when denying the motion for a new trial when this issue was raised, "[the attorney] can only do what the defendant tells him what happened *** or *** he would be subjected to being chastised and

---

[2]If a defendant insists that the judge may consider only guilt or innocence of first degree murder, and no other offense, it would be prudent for the trial judge to make the defendant's position clear on the record.

disciplined." The defendant's position on appeal is essentially that he should have been advised to testify in some way other than as he did. We conclude, therefore, that the defendant has failed to establish ineffective assistance of counsel because his attorney did not have him testify in any way different than he did testify. Further, we note that the trial judge *sua sponte* raised the questions of self-defense, second degree murder and involuntary manslaughter and rejected them. It is apparent, therefore, that the outcome of the trial would have been no different if the defendant's attorney had argued self-defense, second degree murder or involuntary manslaughter.

●3 We also reject the defendant's claim that his attorney was ineffective because he failed to provide an interpreter for the witness, Salih Mujezinovic. The defendant fails to cite a single instance of the witness' allegedly confusing testimony and does not argue that he was prejudiced. As the State notes, the witness gave extensive testimony and responded to many questions in a coherent manner. Although it was obvious that English was not the witness' native language, he gave generally clear and understandable testimony which covers almost 40 pages in the record. Detective Johnson, who interviewed Mujezinovic after the shooting, testified that he conducted the interview in English and that he and the witness "didn't have any problems" with "the language."

●4 Next, the defendant maintains that his attorney was ineffective because he hired an investigator, Rob Hodges, who interviewed many of the witnesses in the case. He maintains: "Mr. Hodges as an unlicensed investigator and convicted felon would be prevented from engaging in effective impeachment of any witnesses he interviewed." In support of this contention, the defendant cites no case law and only one page in the record, which involves a completely unrelated topic. For this reason, he has waived this argument. (See *People v. Saunders* (1991), 220 Ill. App. 3d 647, 659, 580 N.E.2d 1246.) More important, there is no evidence in the record that Hodges was either unlicensed or a convicted felon. We agree with the State's argument that the defendant could not have been prejudiced. Hodges was never called to impeach any witness and there is no evidence to support the defendant's assertion that the State's witnesses' testimony contradicted their earlier statements.

●5 The defendant also maintains that his attorney's investigation of the case was so substandard that he was unaware until it was brought out by the prosecution on cross-examination that Mujezinovic had pleaded guilty to a felony. The witness had been convicted of retail theft. But we note that the judge granted the defendant's attorney's motion to strike any mention of the theft conviction.

In his reply brief, for the first time, the defendant contends that his attorney was ineffective because he failed to cross-examine the State's witnesses and improperly stipulated to the medical examiner's report, which in part lists Bronco's blood-alcohol level at the time of the autopsy. We reject this argument initially because new arguments may not be raised for the first time in a reply brief. (134 Ill. 2d R. 341.) Moreover, neither of these arguments has merit. The defendant's attorney actively and extensively cross-examined all the State witnesses. There is no suggestion in this court that the medical examiner's report was not accurate.

The defendant also maintains that Judge Thomas Fitzgerald, the presiding judge of the criminal division of the circuit court, abused his discretion by denying the defendant's motion to move the venue out of Cook County and "to dismiss the entire Cook County judiciary from hearing this matter." According to the defendant's motion, the victim had been a deputy sheriff assigned to the courtroom of Judge James Bailey at 26th Street and California Avenue in Chicago for many years. The defendant maintained that, because the victim had a close connection to the criminal court in Cook County, the defendant could not receive a fair trial before any judge from Cook County.

At the hearing on the defendant's motion, Judge Fitzgerald did not disqualify all the judges in Cook County but ordered that Judge Bailey's name be removed from the assignment wheel. He said that that did not prohibit the defendant from making motions for substitution of judge by right or for cause from any particular judge. The case was assigned to Judge Michael Toomin. The defendant did not make a motion to substitute another judge for Judge Toomin and did not allege that Judge Toomin was prejudiced against him.

●6 In substance, the defendant's claim is that he was entitled to a change of venue from the county *and* a substitution of all judges in the county, not because of the prejudice of prospective jurors, but because *one* of all the judges in the county might have been prejudiced against the defendant. Obviously, this argument is untenable. See *In re Stiff* (1975), 32 Ill. App. 3d 971, 336 N.E.2d 619.

●7 The defendant next contends that the trial judge erred in sentencing him by considering the decedent's death as an aggravating factor and by failing to consider several factors in mitigation. We have reviewed the remarks of the trial judge before he sentenced the defendant, and we conclude that he did not consider the decedent's death as an aggravating factor and that he properly considered all factors in mitigation as established by the evidence.

The defendant's last claim is that the trial judge erred when he granted a cash bond refund to his trial attorney. After the judge

found the defendant guilty of murder and revoked bond, the following occurred:

> "DEFENDANT: Can I talk to my wife one minute?
>
> JUDGE: You will have a chance to, yes.
>
> DEFENDANT'S ATTORNEY: There will be a motion CBR [cash bond release].
>
> JUDGE: Do you want to do that now?
>
> DEFENDANT'S ATTORNEY: Yeah [*sic*] *** since bond has been revoked. I've talked to my client about the CBR. It's been signed.
>
> JUDGE: What's your desire, Mr. Balaj?
>
> DEFENDANT: Yeah.
>
> JUDGE: CBR attorney. I'll sign the order."

Subsequently, the defendant retained his appellate attorney, who filed a motion to return the bond refund to the defendant. On January 16, 1991, the defendant, his wife and the trial attorney testified at a hearing on the motion for refund. The defendant admitted that he signed an assignment form giving his trial attorney the refund but contended that the form was not explained to him and that he never read the form. He admitted that his friends, who posted the bond money, and his trial attorney had an agreement regarding fees, but denied that he had agreed to pay fees.

The trial attorney testified that he had an agreement with the defendant's friends who posted the bond money and who paid his retainer: he would take his fee out of the refund and then return the remainder to the three men who had advanced the fees. The trial attorney explained that one of these men wanted to testify but was not available for the hearing. The trial judge continued the hearing until January 22, 1991, for the purpose of allowing this additional testimony and "for the final resolution of the matter relating to the bail bond."

●8 The half sheet shows that the parties appeared on January 22 and recites "M/Return of Bail Bond Sust. Mittimus to Issue." Neither side has provided us with a report of proceedings for January 22. Neither the trial attorney nor the defendant's friends who provided the money for the defendant's bail bond have been made parties to this appeal. While we are certain we have subject matter jurisdiction, as did the trial judge, we are also certain we do not have jurisdiction over the trial attorney or the defendant's friends who provided the money for the defendant's bond, and who presumably have received the proceeds, but have not been made parties to this appeal. (See *People v. Dale* (1986), 112 Ill. 2d 460, 463, 493 N.E.2d 1060; *People v. Wurster* (1981), 97 Ill. App. 3d 104, 422 N.E.2d 650; *People v. Dabbs* (1974), 24 Ill. App. 3d 252, 321 N.E.2d 185.) For that

reason, we would be justified in dismissing the appeal from the order of January 22, 1991. However, we have determined that the order should be affirmed.

The defendant has the burden of providing an adequate record on appeal, and where the record provided is incomplete, there is a presumption in favor of the circuit court's ruling. (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944.) Without a transcript of the additional testimony heard on January 22, it is not possible for us to know exactly what the judge heard. We must therefore presume that what he heard on January 22 and what he heard on January 16 support his finding. Moreover, even if the report of proceedings of January 22 showed that the defendant did not validly assign his bond, we would still affirm the trial judge under section 110—7(f) of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 110—7(f)), which grants a trial judge discretion to award a refund, independent of an assignment. See *People v. Kleba* (1982), 110 Ill. App. 3d 345, 442 N.E.2d 605.

Section 110—7(f) provides that a trial judge shall return any available balance of the defendant's bond deposit to the defendant or to his attorney, if the defendant so requests, "unless the court orders otherwise." (Ill. Rev. Stat. 1985, ch. 38, par. 110—7(f).) In *Kleba*, the defendant objected at trial to the award of his bond refund to his attorney, although he had assigned the deposit to the attorney. On appeal he argued that section 110—7(f) allows a trial judge to give an attorney a bond refund only if the defendant requests that action. The *Kleba* court rejected this argument for two reasons. It held that the defendant could not escape his contractual obligation to pay the attorney because he assigned the refund. The court also held that the "unless that court orders otherwise" language gives the trial judge discretion to give the refund to someone besides the defendant, regardless of whether the defendant had expressed a different desire. It held that the judge did not abuse his discretion in giving the attorney the refund even though the defendant objected.

We hold under the facts before us, therefore, that the judge did not abuse his discretion when awarding the refund to the defendant's trial attorney. The record shows that the defendant's attorney had an agreement with those who posted the bond money and that the defendant knew of the agreement. Further, the defendant's friends paid the attorney's retainer, corroborating the attorney's claim that they planned to pay his fee from the refund.

For these reasons, the order granting the bond refund to the

defendant's trial attorney and the judgment of conviction and sentence are affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.