THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES LENZI, Defendant-Appellant.

First District (1st Division)   No. 60127

Opinion filed August 23, 1976.

Michael H. Minton and Gerard A. Facchini, both of Mt. Prospect (Dolores V. Horan, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Michael J. Angarola, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

In a bench trial, the defendant, James Lenzi, was found guilty of voluntary manslaughter and two counts of aggravated battery. He was sentenced to not less than 1 nor more than 5 years in the penitentiary, and appeals.

The defendant presented evidence raising the affirmative defenses of self-defense and assisting a peace officer in making an arrest. Having reviewed the occurrence testimony, the physical evidence found at the scene and evidence as to the reputation of the deceased and his brother, we conclude that the State did not meet its burden of proving the defendant guilty beyond a reasonable doubt.

■■ When a defendant at trial raises the justification of self-defense and assisting a police officer, the burden of proof never shifts to him; the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense or that he was not assisting a police officer, and if defendant's evidence with all the other evidence creates a reasonable doubt of his guilt he should be acquitted. *(People v. Williams* (1974), 57 Ill. 2d 239, 242, 311 N.E.2d 681; *People v. Harling* (1975), 29 Ill. App. 3d 1053, 1057, 331 N.E.2d 653; *People v. Williams* (1965), 56 Ill. App. 2d 159, 205 N.E.2d 749; Ill. Rev. Stat. 1971, ch. 38, pars. 3—2 and 7—14.) Because it is the defendant's initial burden to raise an affirmative defense, we first examine the evidence presented by defendant, and then look to the State's case to see if guilt was proved beyond a reasonable doubt once affirmative defenses were raised.

The defendant testified that at 3:15 a.m. on December 5, 1971, he was in his tavern in Summit, Illinois, with his wife and child, Chicago police officer Raymond Connors, Dennis Jackson, Summit police officer Claude Atkins, and Pam and William Sterenberg. A group of four men and one woman entered and sat at the east end of the "U"-shaped bar. Three

members of the group, Edward Shaughnessy, Garry Wolff and Danny Ehrler ordered beers. George Shaughnessy, the deceased, ordered a soft drink and Sharon, his wife, ordered a mixed drink. Edward Shaughnessy asked Mrs. Lenzi, who was behind the bar, if she knew John Trolio and if he had been in that night. She replied that she hadn't seen him. The Shaughnessy group talked among themselves and Edward Shaughnessy called Trolio several obscene names and then loudly stated to Mrs. Lenzi that when they caught Trolio they were going to assault him and "pump three .38 slugs in his chest." Danny Ehrler stated that she could tell Trolio that he was the guy who was going to do it. Edward Shaughnessy then said that he would be along.

After this loud conversation, the defendant called his wife to the west end of the bar where he was sitting with Connors and told her not to serve the group another drink if they asked. Edward Shaughnessy asked defendant if he was Trolio's buddy and called him a liar when he said no. Edward continued to make obscene comments and threats against Trolio, directing them towards the end of the bar where defendant was sitting.

Defendant asked the group to finish their drinks and leave but Ehrler demanded another drink. Mrs. Lenzi told the group that the bar was closing and asked them to leave. The men stood up and continued to demand more drinks, threatening that they would get another drink one way or another. They began pounding their bottles on the bar. The defendant told them that he owned the bar and that he wanted them to leave immediately. Ehrler and Edward responded by daring defendant to throw them out and Lenzi again asked them to leave.

At this point, Officer Connors stated that he was a police officer, showed them his badge and informed them that he would arrest them if they didn't leave. Edward replied with more obscenities, telling Connors that his badge was no good there. Edward took his beer bottle by the neck and broke it over the bar. Connors told him to drop the broken bottle, but Edward didn't respond. Officer Connors then turned to defendant and asked for his assistance in arresting the men. Edward, with the neck of the broken bottle in his hand, began advancing towards the west end of the bar where defendant was. As Edward continued to advance, defendant asked his wife for his .45 gun. Edward continued approaching to a spot near a post at the east end of the bar. Defendant with his gun in his hand told him to stop, drop the bottle and leave. Edward replied that he wasn't scared of a toy gun and continued to advance with the broken beer bottle. The defendant fired a warning shot into the post near Edward but Edward replied that blanks didn't scare him. He continued to approach defendant with the broken bottle in his raised right arm and asked defendant, "Have you ever seen what kind of

juice squirts out of an eye when you get cut with a beer bottle?" Defendant thought that Edward was going to stick him in the eye and possibly kill someone.

Officer Connors who was a little behind the defendant yelled, "Watch it. There's one behind you." Immediately afterwards the defendant and Edward made contact. Edward threw his right hand with the jagged beer bottle in it towards defendant's head but defendant managed to block it so that it just slid across his face leaving small scratches. The defendant began pushing Edward towards the east wall and the struggle continued until something hit defendant in the right temple. As defendant started to fall he heard a loud bang which was a shot from his gun that wounded Edward. Defendant testified that he did not intend to shoot Edward, and did not even realize that the noise he heard had been his gun because he was dazed by the blow he received on his head.

The defendant testified that he didn't know if he was knocked out momentarily, but that the next thing he recalled was noise and scuffling off to his right in the doorway. He heard Connors yell, "He's got my gun," and looked over and saw Ehrler and Wolff struggling with Connors. George Shaughnessy was behind Connors in a crouched position with Connors' .38 gun pointed at defendant. The three other men (Connors, Ehrler and Wolff) dove to the floor leaving no one between George and the defendant. While George was only 6 feet away still aiming the gun at him, the defendant, a large sized man, rose from his hands and knees to a crouched position, took a step to his right and forward, extended his arm until his gun was within a foot of George and fired. The defendant testified that when he shot George Shaughnessy he believed George was going to kill him. George straightened up, bounced against the door and then fell outside. As George fell, Ehrler crawled past him and left the tavern.

Defendant further testified that Officer Connors scrambled across the floor, picked up his gun where George dropped it when he was shot, and placed it back in his holster. A police car arrived, and defendant handed his gun to Officer Geisler, a Summit police officer, informing him that there had been a fight and he had to shoot someone.

Also testifying for the defense was defendant's wife, Rose Lenzi. She corroborated the details of her husband's story including the obscenities and threats, Lenzi's request for the party to leave, Officer Connors' announcement that he was a police officer and request for assistance, the broken beer bottle and the ensuing fight between Edward and her husband. She testified that as her husband and Edward were scuffling near the east wall, George Shaughnessy took a bottle from the bar and hit Lenzi in the right temple. She corroborated her husband's testimony that the gun went off immediately after he was hit on the head and he and

Edward began falling. She testified that she then went into the back room because her 6-year-old son was there.

Claude Atkins testified that he was present in the bar when the Shaughnessy party entered. He testified that Edward Shaughnessy and Ehrler began asking about Trolio in loud belligerent voices. He proceeded to the washroom but stopped to advise Mr. Lenzi to "watch these guys" because they were "looking for trouble." After returning from the washroom, he left the bar.

Both Mr. and Mrs. Sterenberg testified and corroborated the details of the defendant's account of the beginning of the encounter. They testified that the Shaughnessy party asked about Trolio, used many obscenities and threatened to assault and then kill Trolio. When the group asked for another drink, Rose Lenzi told them it was time for them to leave. When the Shaughnessys began beating their bottles on the edge of the bar, the Sterenbergs left. Both Sterenbergs saw Atkins talk to defendant and Mr. Sterenberg testified that Atkins then left before they did.

On direct examination, the defendant also testified that two Saturdays prior to the occurrence, Edward created a disturbance in the tavern and he had asked him to stop. When Edward didn't the defendant asked him to leave; Edward replied, "I'll be back with my boys."

John Trolio testified that he had attempted to help the defendant stop the disturbance Edward and a friend were making in the bar a few weeks prior to the date of the occurrence. He corroborated the defendant's testimony that Edward had threatened to return "with his boys," and he warned the defendant to watch out for them, informing the defendant that Edward wanted to kill him.

The defendant's account of the fatal fight was supported by physical evidence. First was the broken glass which was found in the bar. Both Officers Corbett (chief of police of Willow Springs) and Geisler testified there was glass on the top of the bar toward the east end where the defense witnesses testified Edward was bouncing his bottle and where the defendant and his wife testified that he broke it. A beer bottle neck with the base broken off and fragments of glass were found near Edward's feet. No other broken glass was observed in the bar. Officers Corbett and Geisler also testified that they observed fresh scratches on James Lenzi's nose and chin and a bump on his right temple. The scratches corroborated the Lenzis' testimony that Edward threatened and cut defendant with a beer bottle and Mrs. Lenzi's testimony that George hit defendant on the head. Officer Geisler testified that he recovered a .45 slug, matched to defendant's gun, from the post where defendant said he had fired the warning shot. The slug was in the post in a position approximately 2 feet above the floor. Though defendant did not testify to hearing Officer Connor fire his gun Sharon Shaughnessy testified Officer

Connors fired his gun. There is evidence that a .38 slug was removed from another post across from the one from which the .45 slug was removed. Although this slug could not be positively matched to Connors' .38 gun, Sharon Shaughnessy's testimony indicates that Connors did have his gun out. This tends to corroborate defendant's claim that he was aiding a police officer. The body of George Shaughnessy was found lying on the middle step outside as if he had fallen out the door.

The defendant presented several witnesses to show the bad reputation of Edward and George Shaughnessy and Danny Ehrler for peacefulness. John Trolio, who had previously been a friend of Edward Shaughnessy for 8 years, testified that his reputation for being a peaceful and law-abiding citizen was bad. Also testifying concerning the bad reputations of George and Edward Shaughnessy as well as Ehrler for being peaceful and law-abiding were Chief Corbett and Officers Thielen (Bridgeview Police Department) and Rosignal (Cook County sheriff's police). The defendant testified that he knew of the bad reputations of George and Edward Shaughnessy and Danny Ehrler prior to the time of the occurrence.

■■ The defendant's evidence showed that George and Edward Shaughnessy came into defendant's tavern looking for trouble, that they were aggressors and threatening and menacing to the defendant. Based on their actions at that time as well as his previous contacts with them, defendant's belief that they were drunken troublemakers, bent on showing that they were tough and frightening those in the tavern was well founded. The evidence offered by the defendant was sufficient to raise two affirmative defenses—self-defense and assisting a police officer.

Though a trial court is under no duty to accept the defendant's version as true, and the credibility of the witnesses is usually for the trier of fact, it is the duty of this court to review the evidence and if it is so improbable, unreasonable or insufficient as to leave a reasonable doubt, the conviction must be reversed. (*People v. Harling* (1975), 29 Ill. App. 3d 1053, 1057, 331 N.E.2d 653; *People v. Shields* (1974), 18 Ill. App. 3d 1080, 311 N.E.2d 212 (abstract opinion).) In this case, the stories of Sharon and Edward Shaughnessy, the State's main witnesses, were confusing, inconsistent, improbable and contradicted by the physical evidence.

The State's major witness was Sharon Shaughnessy, wife of the deceased. She testified that she and her husband had been drinking at another bar from about 9:30 the previous evening with Edward Shaughnessy, Ehrler and Wolff. George told her that Edward was going to the defendant's bar and he wanted to go along because Edward was drunk and he was afraid there would be trouble there. Her husband, Edward and Gary Wolff were all, in her opinion, intoxicated when they arrived at the defendant's bar. She had no opinion as to whether Ehrler

was intoxicated but testified he had been drinking. She sat down with the group and ordered a drink, noticing there were four other persons in the bar. She testified that Edward and Ehrler began asking about Trolio in loud voices and continued to ask his whereabouts despite defendant's answers that he didn't know. She could remember that there was more conversation but couldn't remember what it was and couldn't remember if Ehrler or Edward used any obscenities. She did remember that when Ehrler asked for another round, Rose Lenzi told them she couldn't serve them any more. She testified that Lenzi then stated that if they didn't leave he would put them out. Edward just stood there drinking. Someone in the group made a further comment about Trolio. Mrs. Shaughnessy testified that only seconds after Lenzi had told them to get out, he and Connors rounded the corner and took shots at Edward from only a few feet away but missed him. The credibility of this testimony is weakened by her statement at the inquest that Connors and the defendant had been firing at all of them, not just Edward. According to Sharon, as Edward then turned to put his beer bottle on the bar, Lenzi pushed him up against the wall. As he was sliding down the wall, Lenzi stepped back and shot him once. Sharon said she blocked Lenzi's arm as he took aim again.

She testified that Edward never attempted to strike back or to protect himself in any way. That a person with such a bad reputation for peacefulness would merely stand quietly and not even try to protect himself when ordered to leave, when shot at and when pushed against the wall is hardly credible. Sharon's trial testimony on this point was inconsistent with her voluntary statement to police on the morning of the incident that Edward tried to fight and to protect himself. She also testified that Edward never attempted to break a beer bottle or to protect himself with a jagged remainder and that she had seen no broken glass in the bar. Her testimony is questionable in view of the testimony of the police that they found broken glass on the edge of the bar and a broken bottle neck near Edward's feet. Her testimony also leaves unanswered the cause of the fresh cuts on defendant's face and the bump on his head. At trial, Sharon also testified that her husband, George, did not help his brother. In her pretrial statement, however, she claimed that Ehrler and George tried to help Edward by trying to get the gun away. Her story that George did not help his brother when he was being threatened, pushed and finally shot is incredible in itself, particularly since she testified George went along to keep Edward out of trouble.

Her testimony concerning the fatal shooting of her husband, George, is equally inconsistent and contradictory. She testified that she paid little attention to Officer Connors while defendant was fighting with Edward, but did see Danny Ehrler fighting with him in the aisle. Shortly after Edward was shot she testified that she noticed George holding Officer

Connors from behind in the hallway by the front door. She alleged that Lenzi hit George on the head to loosen his grip on Connors and when he did, Connors turned and kicked George so hard it caused him to double up. This testimony is suspect because of the failure of the pathology report to note any bruises or bumps on the body. Sharon testified that after Connors kicked George, Lenzi shot him. She testified that she could see neither Lenzi's hand nor George's at the time George was shot. She could not, therefore, contradict defendant's testimony that George had Connors' gun. At trial her testimony was extremely confused, but she clearly testified several times that Lenzi shot her husband in the back. This testimony is contradicted by her statement prior to trial that he was shot in the chest as well as by the autopsy report.

She testified that Officer Connors and Lenzi then threw her husband outside partly on the grass and partly on the steps and that subsequently Ehrler moved him further onto the grass. This testimony is contradicted by the testimony of Officer Geisler who testified he found the body on the middle step of the tavern.

Sharon's testimony was further weakened by the fact that she testified that her husband, the deceased, did not take drugs and had never taken any form of morphine. However, the pathological report showed the presence not only of a significant amount of alcohol in his blood but also "acute morphine narcoticism" which contributed to his death.

Sharon Shaughnessy's testimony was unbelievable and improbable. Her credibility was severely impeached by her inconsistencies, contradictions and her obvious interest in the outcome of the trial. Much of her testimony was contradicted by physical evidence from minor points, e.g., whether her husband took drugs, to crucial evidence such as whether her husband was shot in the back or the chest.

Edward Shaughnessy's testimony is also inconsistent, contradicts Sharon's testimony and the physical evidence, but more significantly, it illustrates the improbable nature of the basic story he and Sharon told. He testified that he had drunk two quarts of beer that night and had then gone to Lenzi's bar with his friends. He testified that there were only three people in the bar when they arrived, a fact contradicted by Sharon and the defense witnesses. The group ordered a round of drinks. Edward testified that in a normal voice he asked the others in the bar whether Trolio had been in that evening. When the defendant answered in the negative, Edward testified he said he thought that Trolio slept there and then dropped the subject. This contradicts Sharon's acknowledgment that both Edward and Ehrler kept asking questions and made several comments about Trolio.

Edward testified that suddenly Lenzi screamed obscenities at him and ordered him out of the bar. He heard Ehrler state that they would have to

be thrown out, but this contradicted Sharon's testimony denying that anyone in their party said that. Without further warning, the defendant and Officer Connors rounded the corner and fired at the floor in front of him. This testimony is contradicted by his earlier trial testimony that he felt a bullet go by his knee as well as by the two bullets found in the posts near where Edward was standing. He testified that he never broke or attempted to break a beer bottle against the bar, and never saw any broken glass in the bar that night. This testimony is contradicted by the defense testimony and the broken glass found at the corner of the bar and near his feet where he was lying after being wounded by the defendant.

Edward testified that he stated that defendant was crazy and that he was leaving. He testified that he turned to place his beer bottle on the bar and leave when Lenzi allegedly pushed him against the east wall and shot him. Edward claimed that he did not attempt to fight or protect himself. However, this testimony leaves unexplained the fresh cuts on defendant's face and the broken beer bottle.

Edward's testimony in particular highlights the improbability of the story told by the State's witnesses. Both Edward and Sharon Shaughnessy testified that Edward asked about Trolio's whereabouts in a normal voice, though Sharon testified that they asked more than once. Both either deny the use of any obscenities from their party or conveniently forgot whether any were used. Both insist that without any provocation or warning Officer Connors and the defendant came around the corner of the bar with their guns drawn and shot at them. Connors was at the time a Chicago police officer and the defendant had previously been a police officer in Bridgeview with a good record. That two trained police officers would suddenly pull their guns and shoot at Edward, who claimed he was unarmed, with little or no provocation is virtually unbelievable. Equally unbelievable is that defendant would jeopardize his liquor license by that type of conduct.

Both Edward and Sharon testified that Edward said he was going to leave, but was pushed and shoved and then shot in cold blood before he could leave. It is unbelievable that a man with such a bad reputation, who had threatened to return with "his boys," would make no effort to fight back or at least protect himself. Since the defendant's reputation was as good as Edward's was bad, it is difficult to believe that he would shoot an unarmed man who had just stated that he would leave. Sharon testified that defendant then hit and shot George in cold blood and for no apparent reason. Even without the inconsistencies, contradictions and the impeaching statements made by Sharon and Edward Shaughnessy, the basic story presented in their testimony leaves a reasonable doubt as to the defendant's guilt.

The State's theory of the case becomes even more confusing when the

testimony of Gary Wolff in rebuttal is considered. His testimony is inconsistent with that of the other State witnesses. At a time when Edward claimed he was fighting with Lenzi, Connors and Lenzi, according to Wolff's testimony, were behind him and ordered him to leave. Wolff claimed to have left quietly without saying anything at all to his friends who were still sitting at the bar and with whom he had come. Edward did not remember seeing Wolff leave, and Sharon Shaughnessy's testimony at different times varied as to where Wolff was positioned during the incident. Wolff testified that he heard four or five shots only after he was out of the tavern and at no time reentered to fight with Connors. If the time span described by Edward and Sharon Shaughnessy is to be believed, Wolff would have still been in the bar when the first shots were fired. These contradictions, far from being minor, go to the credibility of each State witness and their attempt to portray themselves as innocent victims of two "killer cops."

The only other testimony contradictory to the defendant's account of the events was Officer Geisler's testimony that he heard a shot and screams and then saw Ehrler running down the street toward his squad car. If Geisler did hear the final shot immediately before spotting Ehrler, then defendant's testimony that Ehrler was fighting with Connors immediately before defendant shot George would be inaccurate. However, we find that Officer Geisler's testimony does little to corroborate the State's account or to destroy the believability of the testimony of defendant and his wife.

■■ The accuracy of Geisler's memory, that he heard a shot before he saw Ehrler, is doubtful in the light of his testimony at five previous hearings that he only heard screams before he saw Ehrler. At one hearing he was specifically asked what occurred which was unusual and what he saw or heard. Geisler volunteered that he heard screams and then saw Ehrler. His continual failure to mention so crucial a noise as a gunshot and the lack of corroboration on this point leave serious doubt regarding the accuracy of his recollection. The failure to refer to a particular fact under circumstances where it would be natural and relevant to do so discredits the testimony as to that particular fact. *People v. Richardson* (1974), 21 Ill. App. 3d 859, 865, 316 N.E.2d 37; *People v. Burchette* (1972), 4 Ill. App. 3d 734, 281 N.E.2d 773.

■■ The defendant's claim of self-defense in this case is credible, convincing and not overcome by the inconsistent and unbelievable evidence offered by the State. To establish a defense of self-defense the defendant must show that unlawful force was threatened against him and that he was not the aggressor, that he believed the danger of harm was imminent, that force was necessary to avert that danger and that the amount of force used was necessary. (*People v. Shields* (1974), 18 Ill.

App. 3d 1080, 311 N.E.2d 212 (abstract opinion); *People v. Brumbeloe* (1968), 97 Ill. App. 2d 370, 240 N.E.2d 150.) The existence of the broken beer bottle at Edward's feet convinces us that the defendant was not the aggressor and was threatened with deadly harm by Edward Shaughnessy approaching him armed with the broken bottle. The defendant had good reason to believe that the danger was imminent and force was necessary to divert it. There were four men in the Shaughnessy group, three of whom had bad reputations; Edward had threatened him several weeks before and did again that night; and he had reason to be concerned for the safety of his wife and child as well as his patrons. The fact that defendant fired a warning shot before attempting to shove Edward against the wall convinces us that he did not lightly enter into the fight but attempted to scare the Shaughnessys to prevent a fight. The shoving match which ensued resulting in the accidental shooting of Edward was not an unreasonable use of force under the circumstances.

It should be noted that the fatal shooting of George Shaughnessy was not separate and distinct but must be viewed as the culmination of what took place in the tavern just before he was shot, including the shooting of Edward. Several separate factors convince us that defendant reasonably believed that shooting George was necessary to protect himself. He had been hit on the head by one member of the group, a fact corroborated by the bump on his head and the testimony of his wife. This would indicate to him that at least one member of the group other than Edward was involved in the fray. The defendant was in a daze after shooting Edward, but must have realized that he had wounded one member and that some of the others might try to get revenge. He heard fighting a short distance away and then heard Connors yell that "he" had his gun. Defendant's account that George was fighting with Connors, that Connors had a gun and that George apparently took Connors' gun and aimed it at the defendant is uncontradicted. Under the circumstances in this case, the defendant's belief that George was going to kill him was reasonable. The test of self-defense is not what the fact finder thinks a reasonable man would believe but what the defendant as a reasonable man believed under the circumstances. (*People v. Johnson* (1971), 1 Ill. App. 3d 616, 274 N.E.2d 221.) When a person is threatened by several bullies, he does not have the time to reason out every response he should make or to judge precisely how much force he has to use to repel the attack and ensure his safety. While it is true he cannot take the law into his own hands, a person placed in the position the defendant was is not in a contest governed by clearly ascertainable rules enforced by an on-the-scene umpire. The question in a case such as this is whether on the basis of quickly unfolding events described months later by testimony that is confusing and contradictory defendant's responses can be said to have been reasonable

under the circumstances. We think they were. *People v. Harling* (1975), 29 Ill. App. 3d 1053 at 1060, 331 N.E.2d 653; *People v. Bailey* (1975), 27 Ill. App. 3d 128, 135-136, 326 N.E.2d 550.

In *People v. Morgan* (1969), 114 Ill. App. 2d 421, 252 N.E.2d 730, the court reversed the defendant's conviction for failure of proof even though the testimony was conflicting and the defendant was the only witness to testify that decedent had a gun. The testimony offered by the defendant in this case was more convincing and was corroborated by other testimony and physical evidence. As in *Morgan*, the defendant's testimony was corroborated with respect to events leading up to the shooting which makes it more probable that the rest of the account is also accurate.

■■ The defendant also raised the defense of assisting a police officer, which was never rebutted by any evidence offered by the State. The evidence is uncontradicted that the Shaughnessys were asked to leave the bar and that when they did not they were trespassing (Ill. Rev. Stat. 1971, ch. 38, par. 21—3). Both the defendant and his wife testified that Officer Connors announced his office and informed the group that he would arrest them if they did not leave. Sharon and Edward Shaughnessy testified that they did not hear Connors announcing his office. However, neither of the Shaughnessys could or did contradict the testimony of the Lenzis that Connors turned to the defendant and asked him for help in arresting them, and that, following this request, the defendant obtained his own gun from behind the bar. Further corroborative of this defense is the Shaughnessys' testimony that Officer Connors came around the end of the bar with his .38 gun drawn, right behind the defendant. If the defendant reasonably believed that he was aiding a police officer, he was entitled to use such force as he reasonably believed necessary to protect himself or another, including deadly force in the appropriate case. (Ill. Rev. Stat. 1971, ch. 38, par. 7—5.) In this case, the defendant knew Connors to be a police officer and his belief that Connors needed help to arrest a group of four men who were conducting themselves in a rowdy, boisterous and threatening manner was certainly reasonable. The State failed to prove beyond a reasonable doubt that Lenzi's original approach to Edward Shaughnessy was not a reasonable effort to aid Officer Connors either to end the trespass or effect the arrest of the offenders. As discussed above, the further actions of the defendant to protect himself were reasonably necessary under the circumstances.

We have reviewed the evidence at length because we recognize the great weight to which factual determinations of the trial judge are entitled and that they should not be set aside when supported by credible evidence which removes all reasonable doubt. On the other hand, it is our responsibility to reverse a judgment of conviction where the record does

not support the finding or where the State's evidence is improbable and unconvincing so that a reasonable doubt is apparent. (*People v. Gokey* (1974), 57 Ill. 2d 433, 438, 312 N.E.2d 637; *People v. Patterson* (1972), 52 Ill. 2d 421, 424, 288 N.E.2d 403; *People v. Dawson* (1961), 22 Ill. 2d 260, 264-65, 174 N.E.2d 817; *People v. Lonzo* (1974), 20 Ill. App. 3d 721, 726, 315 N.E.2d 256.) When careful examination of all the evidence leaves a reviewing court with substantial and well-grounded doubt of guilt, the conviction cannot stand. *People v. Lonzo* (1974), 20 Ill. App. 3d 721, 726, 315 N.E.2d 256; *People v. Garner* (1974), 19 Ill. App. 3d 728, 732, 312 N.E.2d 678.

We believe that the State's testimony, and particularly that of both the wife and the brother of the deceased, in the respects set forth above, was sufficiently improbable and contradictory and contrary to human experience to raise a substantial doubt as to defendant's guilt. We believe that the defendant acted in self-defense and to assist a police officer and that under the circumstances confronting him which were initiated by the deceased and his brother and their companions, the defendant's actions were justified. The judgment of conviction must therefore be reversed.

Judgment reversed.

GOLDBERG, P. J., and BURKE, J., concur.