2019 IL App (2d) 170785-U
No. 2-17-0785
Order filed December 19, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1137 |
| RUSSELL JENKINS, | ) ) ) | Honorable Linda S. Abrahamson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant forfeited review of the trial court's exclusion of evidence, as he did not make an offer of proof, but any error was harmless, as the excluded testimony could not have affected the outcome.

¶ 2   Following a bench trial in the circuit court of Kane County, defendant, Russell Jenkins, was found guilty of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)) and was sentenced to a four-year prison term. Defendant argues on appeal that the trial court erred in barring him from presenting the testimony of a psychologist that might have bolstered his self-defense theory. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant's conviction stemmed from an incident on July 6, 2016, in which defendant, a 37-year-old man, knocked Ryan S., a 13-year-old boy, to the ground, fracturing his pelvis. Defendant weighed over 200 pounds. Ryan weighed about 75 pounds. The incident occurred outside the Batavia Public Library, where defendant, Ryan, and others had essentially been horsing around. Defendant, who had been diagnosed with a mental illness, schizoaffective disorder, maintained that he believed that he was acting in self-defense. He filed a pretrial motion *in limine* to introduce the testimony of psychologist Elisa Lancaster, who, according to motion, would testify about how defendant's illness could affect his perception of the threat that Ryan posed. The transcript of the hearing on the motion suggests that defendant provided the court with a written summary of Lancaster's expected testimony. However, no such summary appears in the record.[1] The trial court reserved ruling on the motion, adding that, if defendant provided lucid testimony about the effects of his disorder, Lancaster would not be permitted to testify. If, on the other hand, defendant was unable to explain how the disorder affected him, Lancaster would be permitted to "testify in a narrow sense kind of generally what it is, how it is diagnosed, how it can affect people."

¶ 5      Ryan testified that he went to the library to hang out with his friend, Shelby, who was there with her mother. Defendant and one of Shelby's friends were also present. The group was outside the library building talking and eating snacks. Ryan testified that "[t]here was a little bit of

---

[1] We note that the prosecutor made a few vague remarks about the nature of Lancaster's proposed testimony. However, the extent to which her testimony would have shed light on defendant's perception of the events surrounding Ryan's injury remains unclear from the record.

horseplay as in like throwing Cheetos at each other and running around but that was it." Ryan saw defendant enter the library building. Fifteen to 20 minutes later, Ryan saw defendant in the lobby. Defendant had been in the bathroom. When defendant came out, Ryan jokingly said that it was weird that defendant had been in the bathroom so long. As Ryan walked toward the library's café, defendant called him a "faggot." Defendant walked outside the library and Ryan followed him out. Defendant then threw a plastic soda bottle at Ryan but missed him. Ryan had not touched defendant and came no closer to him than 15 feet. Ryan saw the bottle roll toward someone's foot. He was not looking at defendant. Ryan then found himself on the ground and his vision went black. Ryan testified, "As [defendant] hit me from behind, I heard him say don't f-u-c-k with me and then I could hear his skateboard fall to the ground and go."

¶ 6    Holly Mai was having coffee with a friend outside the library when the incident occurred. She saw defendant, an adult female, and three children sitting at a table. The woman kept walking in and out of the building. The others were running around and seemed to be playing some sort of game. Mai heard raised voices, and she saw something "thrown extremely hard" toward the boy in the group. She then saw defendant charge at the boy and knock him to the ground. According to Mai, defendant kept going and "yelled something along the lines of he wouldn't stop chasing me or he kept chasing me." Mai marked an aerial photograph of the library building to show where defendant and Ryan were located when defendant started to charge at Ryan. She testified that the distance between them was about the same as the distance from the witness stand to the end of the courtroom. The record indicates that that distance was about 45 feet.

¶ 7    The State rested its case after Mai testified. Defendant then renewed his request to permit Lancaster to testify. The court denied the request. Defendant's attorney described the questions

she would ask Lancaster, but she did not indicate how Lancaster would answer them. The court denied the request.

¶ 8    Shelby testified that she saw Ryan pushing defendant and hitting defendant with a Slim Jim snack. Defendant put up his hands in self-defense, and Ryan fell. Defendant's mother, Paulette Jenkins, testified that, at about the age of 15, defendant started to become lethargic and depressed and started having problems at school. Defendant began seeing a psychiatrist and taking medication. Paulette testified that if people yelled at defendant, hit him, pushed him, or harassed him, it would trigger fear and a defensive response. Defendant had been hospitalized on several occasions. Paulette testified that, because of defendant's mental disorder, his decision-making is irrational and he has poor coping strategies. When scared, he reacts "[l]ike a squirrel or an animal that's cornered and trapped." On the date of the incident, Paulette received a phone call from defendant. According to Paulette, defendant said, " 'Help me. Help me. I am in the bathroom.' " Defendant told Paulette that he had to get away from a kid who was throwing food at him, chasing him, and whipping him with a Slim Jim. Defendant asked Paulette to pick him up.

¶ 9    Defendant testified that Ryan chased him and was being obnoxious. Defendant tried to get away from Ryan. According to defendant, "it wasn't like a game. It was just like I was running away and he was chasing me around." Defendant felt scared and embarrassed. He told Ryan several times to stop. Defendant was riding on a skateboard, but Ryan pushed him off it. Ryan threatened to hit defendant over the head with the skateboard, but then said that he was just kidding. Ryan also started hitting defendant with a Slim Jim. Defendant ran into the restroom, locked himself in a stall, and called his mother. Defendant stayed in the restroom for 10 to 15 minutes. When he left the restroom, he saw Ryan in the café. Ryan came running after defendant, and

defendant threw a plastic soda bottle at him. Ryan continued to chase defendant. Defendant turned around toward Ryan and pushed him with both hands.

¶ 10    Defendant testified that he suffered from, and took medication for, schizoaffective disorder. Without the medication, he experienced delusions and was "absolutely unfunctionable [*sic*]." Even with the medication, however, he would get "somewhat paranoid," depressed, scared, and emotionally unstable. Defendant had been experiencing these symptoms for weeks before the incident.

¶ 11    The trial court credited defendant's testimony that Ryan pushed him off his skateboard and hit him with a Slim Jim. However, the court credited Mai's testimony that defendant charged at Ryan from 45 feet away. The court found that Ryan did not pose an imminent threat to defendant when defendant charged at him and pushed him over. Based on Mai's testimony, the court concluded that it was not objectively reasonable to believe that defendant needed to use force in order to defend himself from Ryan.

¶ 12                                II. ANALYSIS

¶ 13    Defendant argues that the trial court erred in refusing to permit Lancaster to testify about how schizoaffective disorder could affect his perception of the threat that Ryan posed. The impediment to our review of that argument is that the record does not reveal what Lancaster's testimony would have been. As our supreme has explained:

> "It is well settled that when a defendant asserts that she has not been given the opportunity to prove her case because the trial court improperly barred evidence, she must provide the court of review with an adequate offer of proof as to what the excluded evidence would have entailed. [Citation.] 'The purpose of an offer of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the

evidence sought to be introduced.' [Citation.] This enables a reviewing court to determine whether exclusion of the evidence was proper. [Citation.] The 'offer need not be a formal elicitation of the witness's testimony under oath, but may be informal and consist of counsel's representations regarding the contents of the testimony.' [Citation.] An offer of proof must be 'considerably detailed and specific' [citation], and one that 'merely summarizes the witness' testimony in a conclusory manner is inadequate' [citation]." *People v. Way*, 2017 IL 120023, ¶ 33.

Because the record does not include an offer of proof, defendant has forfeited review of the exclusion of Lancaster's testimony. *People v. Gibbs*, 2016 IL App (1st) 140785, ¶ 35.

¶ 14   In any event, any error was harmless, as whatever testimony that Lancaster might have provided could not have altered the outcome of the case. There is no dispute that defendant caused Ryan's injury, but he maintained that his use of force against Ryan was justified under the principles of self-defense. Defendant's self-defense theory is governed by section 7-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/7-1(a) (West 2016)), which provides that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." Although there need not be any actual danger (*People v. Brown*, 19 Ill. App. 3d 757, 763 (1974)), the defendant must subjectively believe that a danger existed requiring the use of force and the defendant's belief must be objectively reasonable. *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 85.

¶ 15   Defendant contends that Lancaster's testimony was admissible to explain how defendant, a man who weighed over 200 pounds, could have subjectively believed that an unarmed 75-pound

boy posed a threat. However, a defendant's belief in the need for self-defense must be *objectively* reasonable. As our supreme court explained long ago,

> "Men, when threatened with danger, are obliged to judge from appearances, and determine by the actual state of things, from the circumstances surrounding them, at least as much as if placed in other and less exciting positions; and it would be monstrous to say, that if they act from real and honest convictions, *induced by reasonable evidence*, they shall be held responsible criminally for a mistake in the extent of the actual danger, *where other reasonable and judicious men would have been alike mistaken*." (Emphases added.) *Campbell v. People*, 16 Ill. 17, 18-19 (1854).

As the high court of a sister state has observed, "[s]tatutes or rules of law requiring a person to act 'reasonably' or to have a 'reasonable belief' uniformly prescribe conduct meeting an objective standard measured with reference to how 'a reasonable person' could have acted." *People v. Goetz*, 497 N.E. 2d 41, 51 (N.Y. 1986).[2] To afford a defense because the defendant believed that his or her actions were reasonable would "allow a legally competent defendant suffering from delusions to kill or perform acts of violence with impunity, contrary to fundamental principles of

---

[2] Illinois courts have been careful to explain that whether the use of force is reasonable depends not on speculation about how a hypothetical reasonable person would have responded, but on whether the defendant, "as a reasonable man," believed that the use of force was necessary. See, *e.g.*, *People v. Lenzi*, 41 Ill. App. 3d 825, 835 (1976). Because "[m]an's reason does not always operate to produce the same result under the same circumstances" (*People v. Duncan*, 315 Ill. 106, 112 (1924)), the circumstances must be "sufficient to excite the fears of a reasonable person and the defendant [must have] really acted under the influence of those fears" (*id.*).

justice and criminal law." *Id.* at 50. Even if Lancaster could have explained why defendant might have subjectively believed that Ryan posed a threat to his safety, the belief would not have been objectively reasonable.

¶ 16                                  III. CONCLUSION

¶ 17    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 18    Affirmed.