2024 IL App (1st) 220918-U

No. 1-22-0918

Order filed April 26, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 17166 |
| TIERA GRAVES, | ) ) | The Honorable Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*: We reverse defendant's first-degree murder conviction where the State failed to disprove beyond a reasonable doubt that she acted in self-defense.

¶ 2     Tiera Graves was found guilty of first-degree murder and sentenced to 28 years in prison. On appeal, Graves argues: (1) the State failed to disprove beyond a reasonable doubt that she acted in self-defense or, alternatively, her conviction should be reduced to second-degree murder; (2) the circuit court erroneously excluded evidence at trial in violation of her right to present a defense;

(3) the prosecutor made improper remarks during closing arguments; (4) the court failed to ensure the jurors understood that she is presumed innocent of the charges; and (5) her 28-year sentence is excessive. For the following reasons, we reverse Graves's conviction.

¶ 3                                    I. BACKGROUND

¶ 4        Tiera Graves was charged with multiple counts of first-degree murder in the fatal shooting of Marilyn Duffie.[1] Following a jury trial, Graves was found guilty of murder and sentenced to 30 years' imprisonment. Graves's sentence was reduced to 28 years after reconsideration.

¶ 5        Prior to trial, Graves filed a motion seeking to admit certified copies of Duffie's prior convictions for assault and battery and the testimony of Duffie's mother, Delores Rogers, who was the complainant involved in Duffie's battery conviction. The court allowed the admission of the convictions but precluded Rogers from testifying about the battery conviction. Graves also filed a motion *in limine* to admit a recording of a 9-1-1 call she made on the day of the shooting. The court excluded the 9-1-1 recording as inadmissible hearsay.

¶ 6        At the jury trial, several witnesses provided their account of events surrounding the shooting. Graves testified that in October 2016, she lived on the second floor of the Concordia Apartments with her son and cousin, Duffie, who had been staying with her for two months. Duffie was homeless before she moved in with Graves, and Graves allowed Duffie to live with her until Duffie became self-sufficient. At some point, Graves and Duffie began arguing about Duffie bringing men into the apartment. On October 18, 2016, Graves found a used condom in the hallway of her apartment while she and her son were unloading groceries and confronted Duffie about it

---

[1] Decedent's last name appears as "Duffie" and "Duffy" throughout the record. We refer to decedent as "Duffie" as it appears in the indictment.

over text message. Duffie called Graves yelling and spewing foul names, and Graves told Duffie to calm down. When Graves arrived at her apartment door, she realized Duffie locked her out. Graves called Duffie, and Duffie opened the door but blocked Graves from walking through the doorway. Duffie eventually moved "over a little," and Graves squeezed passed Duffie into the apartment. Graves walked into the kitchen as Duffie followed behind her telling Graves to stop treating her like a child. Graves kept her distance and told Duffie to calm down. Duffie attempted to push Graves, and Graves walked around the kitchen island for safety. Duffie then pulled out a knife and stated she was going to show Graves that she was not a child. Graves told Duffie to leave and called the police. Graves then called Rogers, Duffie's mother, to "come and get [Duffie]."

¶ 7    Graves indicated Duffie left the apartment but came back using her apartment key. Graves was standing at the door entrance at that time and asked Duffie to return the key. Duffie punched a hole in the apartment wall and followed Graves into the kitchen, where they continued to argue across the counter. Duffie punched the fish tank, causing water, rocks, and fish to spill onto the floor, then left the apartment. Graves locked the apartment door and called her grandmother, Eleanor Webster. Thereafter, Graves heard Duffie tugging at the door. Graves went to the door and told Duffie the police were on their way and she needed to leave. Duffie had a stick in her hand and stated she was going to mess up Graves's car. Duffie left again and Graves sat down and waited for the police. Sometime later, Duffie came back to the apartment with two men. Graves grabbed her gun and put it on her waistband. Graves then went back to the door and told Duffie she needed to leave. Duffie stood at the door, holding a stick in her hand and beating and kicking the doorframe. Duffie eventually left, and Graves continued to wait for the police. About 10

minutes later, Graves went downstairs to talk with Duffie about damaging her car. Graves carried her gun with her because she was scared.

¶ 8       Graves testified she went to LaShay McCoy's apartment located on the first floor and asked for Duffie. Duffie exited McCoy's apartment, and Graves told Duffie not to damage her car. Pulling the apartment keys out of her purse, Duffie stated that the car was the least of Graves's worries, and the two began arguing again. Graves tried to get Duffie to "go talk about it," but Duffie again threatened to mess with Graves's car. At one point, Graves dropped her cell phone and asked a neighbor nearby, Sharon Coleman, to hold it. Coleman gave the phone back to Graves and closed her apartment door. Graves and Duffie continued arguing. Graves then realized "there's no getting to [Duffie]" and began to walk away. As Graves walked up the stairs, she felt Duffie "grab me, wrestling me, pulling me towards her." Graves then grabbed her firearm and fired one shot at Duffie. According to Graves, she was scared for her life in that moment and believed she could be stabbed to death because Duffie was armed with the knife she had waved at Graves earlier. Graves then went upstairs, put down the gun, and sat on the couch. When the police arrived, Graves was mopping the spilled water from the fish tank. Graves told the officer where the gun was located and she was arrested. Graves testified that she was aware of Duffie's prior convictions for battery and assault. Graves believed she was defending herself and that it was necessary to shoot Duffie to prevent her death.

¶ 9       Rogers testified Duffie called her on the day of the shooting. Duffie sounded upset, and Rogers told her to leave the apartment. Rogers then received a call from Graves. Graves told Rogers that "she was going to shoot [Duffie]" if "[Duffie] ran up on her" meaning "[i]f she get in

her face." Rogers advised Graves to walk away and talk about the issue when Graves and Duffie calm down. The call then ended abruptly. Later, Graves called Rogers and stated, "I shot her."

¶ 10    McCoy testified she lived on the first floor of the Concordia Apartments on the day of the shooting. That evening, McCoy was in her apartment when she heard individuals arguing upstairs. She looked outside and saw a group of people looking toward Graves's apartment. Duffie then came to her apartment asking for peroxide for an injury to her knuckles. Moments later, Graves came to McCoy's apartment asking for Duffie to come out and talk. Duffie left McCoy's apartment and an argument ensued between Duffie and Graves. McCoy closed her door and heard a gunshot about five minutes later. When McCoy opened the door, Graves was walking back to her apartment and Duffie was on the ground. McCoy did not see Duffie with a weapon but did see her carrying a purse.

¶ 11    Sharon Coleman testified she lived on the first floor of the Concordia Apartments with her daughter, Zantrea Coleman, and her daughter's boyfriend. On the day of the shooting, Sharon saw Graves and Duffie arguing in front of her apartment. Sharon watched the argument and did not see anything in Graves's or Duffie's hands. After several minutes, Sharon closed her door and then heard a gunshot. Sharon opened her door and saw Graves walking up the stairs, while Duffie walked toward the parking lot holding her chest, then fell to the ground. Sharon did not see any weapons in Graves's or Duffie's hands but did see Duffie with a purse.

¶ 12    Zantrea testified that she also saw Graves and Duffie arguing both on the second floor and in front of her door. Neither Graves nor Duffie had anything in their hands but Graves had a bulge in the back of her waist. Shortly after Sharon closed their door, Zantrea heard a gunshot. When they opened the door, Duffie was holding her chest and stated, "Oh my God, this bitch shot me."

Duffie was wearing a closed purse. Zantrea called the police and went to the parking lot where Duffie was lying.

¶ 13    Khalil Harris testified that he saw two women arguing when he arrived at McCoy's apartment on the day of the shooting. He watched the argument for a few minutes then went to McCoy's apartment. Duffie came to the apartment to clean her hand; Graves arrived a few minutes later. After Graves and Duffie left the apartment, Harris heard a gunshot.

¶ 14    Causha Mosely testified that she was working as security at the Concordia Apartments on the day of the shooting. She heard a gunshot while she was in the office, then went to the dispatched location. When she arrived, Mosely saw a woman lying on the ground. Chicago police officer Jason Toliver testified he and his partner were dispatched to Concordia Apartments. When they arrived, Duffie was lying on the ground. After speaking with several people, Toliver and his partner went to a second-floor apartment. Toliver saw Graves mopping up blood, water, and rocks spilled from an aquarium or fish tank. Toliver and his partner entered, spoke with a man sitting on the couch, and asked Graves where the gun was located. Graves directed them to a closet by the door, and Toliver saw a gun on the closet shelf.

¶ 15    Dr. Ponni Arunkumar testified she conducted Duffie's autopsy. She concluded Duffie's cause of death was a gunshot wound to the chest. The course of the gunshot was front to back, right to left, and downwards. There was no evidence of close-range firing, which suggested to Dr. Arunkumar that the gun was fired at least two feet or more away from Duffie's body. The toxicology reports showed no signs of alcohol, opiates, cocaine, or fentanyl in Duffie's system.

¶ 16    The police recovered a fired 9mm cartridge from the apartment staircase leading to the second floor and a semi-automatic 9mm pistol from the closet shelf in Graves's apartment.

Forensic testing results showed that the fired cartridge case recovered from the stairs was fired from the pistol recovered in Graves's apartment. The police collected Graves's shirt containing suspected blood stains. DNA analysis results determined Duffie was the donor of the female DNA profile from the blood stains on the shirt. The police recovered a steak knife from a purse found on Duffie's body, but no blood was indicated on the knife.

¶ 17    After the parties rested their case, the circuit court instructed the jury, in relevant part, on self-defense and second-degree murder. The jury found Graves guilty of first-degree murder. Graves filed a post-trial motion alleging the trial court erred in: (1) excluding the 9-1-1 recording, (2) excluding Rogers's testimony regarding Duffie's battery conviction, and (3) sustaining several State objections at trial. Graves also argued that the State failed to prove her guilty beyond a reasonable doubt of first-degree murder, and that the prosecutor made improper remarks in closing argument. A supplemental post-trial motion was filed after Graves obtained new counsel. The supplemental motion argued Graves's murder conviction was inconsistent with the evidence of Duffie's aggression. The court denied the motions.

¶ 18    The trial court sentenced Graves to 30 years' imprisonment. Graves filed a motion to reconsider sentence, and the court reduced Graves's sentence to 28 years after reconsideration. This appeal followed.

¶ 19                                    II. JURISDICTION

¶ 20    The trial court sentenced Graves on May 27, 2022, and she filed a timely motion to reconsider sentence. The court granted the motion on June 6, 2022, and Graves filed a notice of appeal on the same day. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013)

and Rule 606 (eff. Mar. 12, 2021), governing appeals from final judgments of conviction in criminal cases.

¶ 21                                    III. ANALYSIS

¶ 22    On appeal, Graves argues: (1) the State failed to disprove beyond a reasonable doubt that she acted in self-defense or, alternatively, her conviction should be reduced to second-degree murder; (2) the court erroneously excluded evidence in violation of her right to present a defense; (3) the prosecutor made improper remarks during closing arguments; (4) the court failed to ensure the jurors understood that she was presumed innocent of the charges; and (5) her sentence is excessive. First, we will review Graves's self-defense claim.

¶ 23    Graves argues that the State failed to disprove beyond a reasonable doubt that she acted in self-defense because the State's evidence was consistent with Graves's testimony that she was defending herself when Duffie had destroyed her property, threatened her with a knife, and pulled her on the staircase. The State claims that the evidence showed Graves was the aggressor and not in danger of imminent harm when she shot Duffie, and thus, the jury could have found that Graves did not act in self-defense.

¶ 24    Whether a defendant acted in self-defense is a question for the jury. *People v. Hayes*, 2011 IL App (1st) 100127, ¶ 31. The standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts. *People v. Harris*, 2018 IL 121932, ¶ 26. "A reviewing court will not reweigh the evidence or substitute its judgment on these matters

for that of the jury." *Id.* A conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt. *Id.*

¶ 25    First-degree murder occurs when a person kills another individual without lawful justification. 720 ILCS 5/9-1 (West 2020). One lawful justification that a defendant may raise is the affirmative defense of self-defense. See 720 ILCS 5/7-1(a) (West 2020). Specifically, a defendant is "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." *Id.* Thus, the defendant must establish some evidence of the following elements: (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 127-28 (1995). "Once an affirmative defense is raised, the State has the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." *Id.* at 127. If the State negates any one of the self-defense elements, the defendant's claim of self-defense must fail. *Id.* at 128. If the State fails to prove the defendant was not justified in using force that he used, then the jury must find the defendant not guilty of first-degree murder. *Id.*

¶ 26    "The test of self-defense is not what the fact finder thinks a reasonable [person] would believe but what the defendant as a reasonable [person] believed under the circumstances." *People v. Lenzi*, 41 Ill. App. 3d 825, 835 (1976). The right to self-defense arises before the first blood is

drawn. *People v. Speed*, 52 Ill. 2d 141, 146 (1972). It is not necessary for the deceased to have actually possessed or used a deadly weapon to justify self-defense. *People v. White*, 87 Ill. App. 3d 321, 324 (1980). "If a person is confronted with such means or force as to induce a reasonable belief that he is in danger of loss of life or of suffering great bodily harm, that is all the law requires to justify a killing as self-defense." *Id.*

¶ 27    In *White*, this court found that a defendant reasonably believed he was in danger of imminent harm when the decedent had previously harmed the defendant and was threatening him at the time of the occurrence. *Id.* There, the defendant was charged with voluntary manslaughter after he fatally shot the decedent and raised a self-defense claim. *Id.* at 322. The trial evidence revealed the decedent had cut the defendant with a knife some months prior to the shooting. *Id.* On the day of the shooting, the decedent was angry with the defendant about a prior incident and followed the defendant to his apartment where the two began arguing. *Id.* The defendant and his wife told the decedent to go home, but the decedent brandished a knife and made threats. *Id.* The decedent was told again to go home, and he continued to approach the defendant. *Id.* The defendant then fired one shot resulting in the decedent's death. *Id.* Given the evidence, including the decedent's prior violent behavior against the defendant and his threats prior to the shooting, this court found the defendant acted in self-defense. *Id.* at 324.

¶ 28    Similarly, we conclude Graves met the elements of self-defense under the circumstances of this case. Graves's largely uncontroverted testimony revealed she and Duffie's argument began when Graves texted Duffie about an issue she discovered in the hallway of the apartment. Duffie called Graves yelling and calling her foul names and locked Graves out of her apartment. Duffie eventually unlocked the apartment door, and the two continued to argue as Graves walked toward

the kitchen. During the argument, Duffie threatened Graves with a knife, punched a hole in the apartment wall, and punched the fish tank causing debris to spill onto the floor. The police corroborated the damage to the wall and the fish tank.

¶ 29    Graves continuously told Duffie to calm down, leave the apartment, and the police were on the way. Duffie eventually left but continued to threaten Graves outside the apartment door. At first, Graves saw Duffie with a stick in her hand stating she was going to mess up Graves's car. Duffie later returned to the door with two men. Duffie eventually went downstairs, and Graves continued to wait for the police. A few minutes later, Graves decided to go downstairs and talk with Duffie about damaging her car. Graves stated that she took her gun with her because she was scared. When Graves found Duffie, they continued the verbal argument. Graves stopped arguing and walked back to her apartment. Duffie followed and as Graves walked up the staircase, she felt Duffie "grab me, wrestling me, pulling me towards her." Graves then grabbed her firearm and fired one shot at Duffie.

¶ 30    The State argues that Graves was the aggressor because she was not afraid, but angry and frustrated with Duffie. The State asserts that after the altercation ended, Graves called Rogers and threatened to shoot Duffie, armed herself with a gun, pursued Duffie, requested that she come out of McCoy's apartment, and then continued the altercation. The State further argues that there was also no evidence of a close-range firing, meaning Graves was at least two feet away when she shot Duffie.

¶ 31    We find the evidence refutes the State's argument. First, the State provides an unreasonable interpretation of Graves's statement to Rogers. Rogers testified that Graves stated, "she was going to shoot [Duffie]" if "[Duffie] run up on her" meaning "get in her face." By its plain meaning, a

rational trier of fact could only conclude that the statement meant Graves would defend herself if Duffie attacked her. Moreover, the State's theory that Graves was angry and frustrated with Duffie is negated by the fact that no witnesses saw Graves escalate the verbal argument or expose the gun during the argument, that she walked away from the argument, and did not shoot until Duffie pulled her on the staircase, which is corroborated by the evidence showing the fired cartridge was found on the staircase. Also, the forensic evidence establishing that Graves did not fire the gun at close range does not disprove her account that Duffie tried to pull her on the staircase. Without more evidence regarding the precise distance between Graves and Duffie at the time of the shooting, any inference contrary to Graves's testimony is dubious and a rational trier of fact could only conclude Duffie pulled Graves despite no evidence of a close-range firing.

¶ 32    The State also asserts the evidence showed Graves was not in danger of imminent harm because Duffie was not displaying or threatening Graves with a weapon at the time of the shooting and a "tug" does not constitute imminent harm. We first note that Graves's testimony about Duffie's behavior on the staircase cannot be diminished to a "tug" absent any evidence to the contrary. The record shows the only references to a "tug" are from the attorneys' questioning and comments. Graves explicitly testified that Duffie grabbed, wrestled, and pulled Graves towards her while they were on the staircase. Graves stated she became scared that Duffie would stab her to death and fired one shot to defend herself. This testimony refutes the State's argument regarding imminent harm. While there is no evidence Duffie displayed the knife found in her purse at the time of the shooting, the law does not charge a person in Graves's situation to use infallible judgment when she believes she is in danger of losing her life or suffering great bodily harm. See *White*, 87 Ill. App. 3d at 323; *People v. Lenzi*, 41 Ill. App. 3d 825, 835 (1976) ("[t]he test of self-

defense is not what the fact finder thinks a reasonable [person] would believe but what the defendant as a reasonable [person] believed under the circumstances").

¶ 33    Lastly, the State claims Graves's use of force was not objectively reasonable because there was no evidence Duffie displayed or threatened to stab Graves with a knife. But the law does not require the deceased to possess or use a deadly weapon to justify self-defense. See *White*, 87 Ill. App. 3d at 324. Here, the evidence showed Graves was confronted with force that induced a reasonable belief that she was in danger, particularly given her knowledge of Duffie's violent behavior. See *Id.* Graves testified she felt Duffie "grab me, wrestling me, pulling me towards her" and, after experiencing Duffie's destructive behavior and threat with a knife earlier that day, Graves was afraid for her life and fired one shot to defend herself.

¶ 34    Even viewing the evidence in the light most favorable to the State, the evidence shows Graves reasonably believed she was in danger of losing her life or suffering great bodily harm. Prior to the shooting, Duffie acted in an aggressive manner toward Graves. Duffie punched a hole in the apartment wall and the fish tank and threatened Graves with a knife while Graves called the police and continuously asked Duffie to leave the apartment. Graves was also aware of Duffie's violent criminal history. Although the two continued the argument downstairs, Graves realized that it was going nowhere and walked away. Duffie followed, then grabbed, wrestled, and pulled Graves on the staircase. Having been subject to Duffie's threats and violent behavior that day, Graves became afraid that Duffie would stab her to death and fired one shot to defend herself. While the State theorizes that Graves's testimony exhibits her frustration and anger with Duffie, rather than fear, we find its arguments insufficient to disprove beyond a reasonable doubt that

Graves acted in self-defense. Because our decision on the issue is dispositive of this appeal, we need not address the remaining issues.

¶ 35                                    IV. CONCLUSION

¶ 36    We find the State failed to prove beyond a reasonable doubt that Graves was not acting in self-defense when she shot Duffie. Accordingly, we reverse Graves's conviction.

¶ 37    Reversed; conviction vacated.